A05A1195. WALKER et al. v. GILES et al.
(624 SE2d 191)

Bernes, Judge.

Appellants Kimberly D. Walker and her husband Scott Walker, individually and as the surviving parents of their unborn child, brought the instant medical malpractice action against appellees Dr. Wendy S. Giles, Dr. Vonda L. Klein, Dr. J. Philip Gingrey, and their OB-GYN practice, alleging that appellees failed to properly diagnose and treat Ms. Walker's acute appendicitis, causing her to suffer severe physical and cognitive damage and the loss of her fetus after her appendix ruptured. After a jury trial had commenced and appellants had presented their case-in-chief, appellees moved for directed verdict on the grounds that appellants had failed to present evidence showing cause-in-fact and proximate cause. The trial court granted the motion, from which appellants now appeal. For the reasons set forth below, we reverse.

> A directed verdict is proper only if there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a verdict. In determining whether a conflict in the evidence exists, the court must construe the evidence most favorably to the party opposing the motion for a directed verdict.

(Footnotes omitted.) Knight v. West Paces Ferry Hosp., 262 Ga. App. 220, 220-221 (585 SE2d 104) (2003). See also Hodges v. Vara, 268 Ga. App. 815, 818 (1) (a) (603 SE2d 327) (2004). We must reverse the trial court's grant of a directed verdict if there was "any evidence" to support the nonmovant's claims. Id. at 818 (1) (a). See also Snider v. Basilio, 276 Ga. App. 315 (1) (623 SE2d 521) (2005).

Mindful of this standard, we turn to the record in the instant case. At the time of the events at issue, Kimberly Walker, a thirty-year-old mother of two children, was fifteen-to-sixteen weeks pregnant. During the course of her pregnancy, Walker saw the obstetricians at Marietta OB-GYN Affiliates, P. A. Walker had been a patient of Marietta OB-GYN during a prior pregnancy and had reestablished her relationship with the physicians there.

*Wednesday, June 20, 2001.* Viewed in the light most favorable to the nonmovant, at approximately 9:00 a.m. on Wednesday, June 20, 2001, Walker experienced the onset of severe periumbilical pain, vomiting, diarrhea, and a decreased appetite. Because she "was in too much pain," was "doubled over," and "could not drive," Walker had her mother-in-law drive her to Marietta OB-GYN for treatment that afternoon. After she arrived at Marietta OB-GYN, a nurse practitioner evaluated Walker and assessed her as having a viral syndrome which had caused her to become dehydrated.[1] As a result, Walker was provided anti-nausea medication and was sent to the Outpatient Infusion Center at Kennestone Hospital for rehydration.

After receiving an infusion of fluids, Walker remained in severe pain and could not walk, requiring that she be transported by wheelchair to the main hospital for admission. Walker was admitted as a patient to the Women's Center at Kennestone Hospital at approximately 6:00 p.m. by Dr. Giles, the treating obstetrician with Marietta OB-GYN who was on call at the hospital that evening. Dr. Giles evaluated Walker, noted that there was mild abdominal tenderness, and diagnosed Walker with viral gastroenteritis, an inflammation of the digestive tract commonly referred to as an "intestinal bug."

Dr. Giles ordered that a complete blood study be done of Walker upon her admission. At approximately 10:00 p.m., the results of the blood study, which included a breakdown of Walker's white blood cell count, were called to Dr. Giles. According to appellants' medical experts, the blood study showed a "shift to the left," which represented an overall increase in a patient's white blood cell count marked by an increase of immature white blood cells called "segs" but a decrease in lymphocytes. Appellants' medical experts later opined that the "shift to the left" shown by the blood study was inconsistent with an initial diagnosis of viral gastroenteritis and instead indicated that Walker had a potential bacterial abdominal infection, particularly when the results were compared to the baseline blood study

---

[1] Medical records introduced at trial reflect that Walker informed the nurse practitioner that in the week prior to the onset of her acute symptoms, she had experienced sporadic nausea, vomiting, and diarrhea, and her mother-in-law and husband also had been sick.

results from Walker's prior pregnancy found in her office chart that were taken at approximately the same stage of gestation.[2] Dr. Giles did not order a follow-up blood study, x-rays, or an abdominal CT scan[3] after being notified of the blood study results.

*Thursday, June 21, 2001.* Dr. Klein, another obstetrician at Marietta OB-GYN, came on call at the hospital on Thursday morning, June 21, and assumed care over Walker until Friday morning. A urinalysis done on Thursday morning showed that Walker was no longer dehydrated. Nevertheless, according to appellants' medical experts, Walker's medical chart from Thursday contained several indicators that were demonstrative of Walker's overall worsening bacterial infection, including complaints of vomiting and trends of decreasing appetite, decreasing blood pressure compared against her baseline pressure during pregnancy, and a rising pulse rate. According to Walker's husband, Walker also continued to complain of stomach pain on Thursday even with pain medication.

Appellants' medical experts opined that Walker's clinical condition on Thursday was inconsistent with a diagnosis of viral gastroenteritis because the latter condition normally shows early improvement once a patient is properly hydrated. Dr. Klein did not order a follow-up blood study or an abdominal CT scan on Thursday or early Friday morning. Nor is there evidence in the medical chart that Dr. Klein performed an abdominal examination of Walker at any time during this period.[4]

*Friday, June 22, 2001.* Walker's medical chart for early Friday morning reflects a continued trend of elevated pulse rate and lowered blood pressure. Walker continued to complain to her husband about stomach pain, information which her husband says that he conveyed to Dr. Klein, who reassured him that Walker only had the "stomach flu" and would be fine "in a couple of days," and who discussed with them the decision that had been reached to discharge Walker later that morning. Appellants' medical experts contended that Walker's

---

[2] It can be surmised from the cross-examination of appellants' medical experts and from the record as a whole that appellees' medical experts, had they testified, would have disagreed over what could have been deduced from the "shift to the left" reflected in Walker's initial blood study results.

[3] A "CT scan" is a method of taking a body image using x-rays which permits a physician to obtain a cross-sectional image of a patient's body part. See Webster's Second New College Dictionary, p. 181 (3rd ed. 2005). The parties dispute over how safe it is to conduct an abdominal CT scan on a pregnant patient.

[4] Again, it can be deduced from the record that appellees would have contested appellants' version of the facts, including but not limited to the specific symptoms manifested by Walker and their severity, whether an abdominal CT should have been performed on Walker given the potential risks involved, and whether Dr. Klein performed a physical examination of Walker while she was in the hospital.

condition was not improving during this period based on the notations in her medical chart reflecting decreased appetite, lowered blood pressure, and a rise in pulse rate.

Dr. Gingrey became the on-call treating obstetrician at the hospital on Friday morning, June 22, and assumed care over Walker through the weekend. Walker's husband testified that he did not leave the hospital room on Friday morning and that he never saw Dr. Gingrey come into the room and assess Walker at any time on Friday.[5] Although Walker's medical chart contains entries by Dr. Gingrey on Friday morning, the entries regarding Walker's condition could be read as inconsistent with previous information in the nurse notes and medical chart notations, when viewed in the light most favorable to the nonmovant. Dr. Gingrey did not order a blood study or an abdominal CT scan on Friday morning. At approximately 11:00 a.m., Walker was discharged from the hospital under orders of Dr. Gingrey.

Upon her discharge, Walker, who was still "in a lot of pain" according to her husband, went home for approximately 12 hours. During this time, Walker's condition grew increasingly painful. Walker's husband drove her to the emergency room at Kennestone Hospital at approximately 11:00 p.m. on Friday. In the emergency room, Walker presented with severe right upper and lower quadrant abdominal pain, a life-threatening blood pressure of 60/0, a high pulse rate, and blurred vision.

*Saturday, June 23, 2001.* Shortly after midnight in the early morning hours of Saturday, June 23, Walker was seen by the emergency room physician. The emergency room physician ordered a complete blood study. According to appellants' medical experts, the blood study results indicated a significant worsening of Walker's abdominal bacterial infection when compared with the results of the blood study done on Wednesday. The emergency room contacted Dr. Dennis Smith, the on-call general surgeon, to assess Walker.

At approximately 3:00 a.m. on Saturday, Dr. Smith visited Walker in the emergency room. Dr. Smith conducted a physical examination of Walker and diagnosed her with acute cholecystitis, a bacterial inflammation of the gallbladder, which required the removal of her gallbladder. He informed Walker and her husband that the surgery would be scheduled for Monday morning since he was going out of town for the weekend, but that his partner, Dr. Novak, could perform the surgery earlier if an emergency arose. Dr. Smith

---

[5] It is clear from the record as a whole that Dr. Gingrey would have disputed this version of the facts, had he testified during the appellees' case-in-chief.

then had Walker readmitted to the Women's Center at the hospital. In his orders, Dr. Smith wrote: "Please notify Dr. Gingrey et al. of [patient's] location."

At or about 9:00 a.m. on Saturday, Dr. Gingrey visited the floor in the Women's Center where Walker's room was located and reviewed her chart. Dr. Gingrey wrote orders on the chart, including one order changing an anti-nausea medication initially prescribed by Dr. Smith. However, Walker's husband, who stated that he remained with Walker all day Saturday, testified that he never saw Dr. Gingrey come into Walker's room on Saturday morning or physically examine Walker at any point that day. Walker's husband further testified that he did not see any doctors visit Walker at any time on Saturday, including Dr. Smith or his partner Dr. Novak.

*Sunday, June 24, 2001.* At approximately 1:20 a.m. on Sunday, June 24, Dr. Gingrey arrived at the Women's Center after being notified that Walker's membranes had spontaneously ruptured. Dr. Gingrey ordered that Walker continue to receive pain medication and intravenous antibiotics, and he noted in his progress notes that a spontaneous miscarriage was "anticipate[d]." At 2:15 a.m. and 3:15 a.m., respectively, Dr. Gingrey spoke with Dr. Novak, notifying him of Walker's condition and informing him that he believed Walker might have appendicitis rather than cholecystitis. Later that morning, Dr. Novak arrived at the hospital and performed emergency surgery. During the course of the surgery, Walker was found to have acute gangrenous ruptured appendicitis, leading Dr. Novak to remove her appendix. Walker also was diagnosed with septic infection.

After undergoing the appendectomy, Walker lost her fetus, developed acute respiratory distress syndrome ("ARDS"), and had to be placed on a mechanical ventilator. Walker remained on mechanical ventilation for over a month. While on the mechanical ventilator, Walker suffered a stroke. Walker now has permanent right-sided paralysis, significant cognitive deficits, and a recurring seizure disorder.

Appellants subsequently commenced this medical malpractice action against appellees Dr. Giles, Dr. Klein, Dr. Gingrey, and their practice, Marietta OB-GYN, alleging that they were negligent, jointly and severally, in failing to timely diagnose and treat Walker's appendicitis, proximately resulting in her impaired physical and mental condition and the loss of her child.[6] The case proceeded to a jury trial on the theory that, had appellees acted within the appropriate

---

[6] Appellants also sued the hospital where Walker was treated as well as Dr. Smith, Dr. Novak, and their practice. These parties settled with appellants prior to trial and were dismissed from the case with prejudice.

standard of care and properly diagnosed and treated Walker in a timely fashion, Walker would have had surgery to remove her appendix prior to its rupture, and, therefore, would not have become septic, lost her fetus, developed ARDS, and suffered a stroke resulting in right-sided paralysis and other deficits.

At trial, Walker's medical experts testified that Dr. Giles deviated from the applicable standard of care on Wednesday night when she was the on-call obstetrician. They testified that Dr. Giles acted negligently by failing to order a follow-up complete blood study to see if Walker's condition was worsening, given that Dr. Giles had received Walker's initial blood study results that showed a "shift to the left" signaling (in their view) a potential bacterial abdominal infection rather than viral gastroenteritis.

Walker's medical experts also opined that Dr. Klein deviated from the standard of care on Thursday when she was the on-call obstetrician. They contended that Dr. Klein committed negligence by failing to order a follow-up blood study of Walker, given the initial blood study results from Wednesday that were made available to Dr. Klein, combined with Walker's continuing signs and symptoms that the experts believed were inconsistent with what would have been observed in a fully-hydrated patient suffering from viral gastroenteritis. In light of these indicators, Walker's medical experts further testified that Dr. Klein deviated from the standard of care by not consulting with a general surgeon and ensuring that an abdominal CT scan was performed on Thursday, which would have shown that Walker had appendicitis.

According to Walker's medical experts, Dr. Gingrey deviated from the standard of care on Friday morning by discharging Walker in light of what the experts believed to be her worsening condition reflected in her medical chart, by not ordering a follow-up blood study, and by failing to consult with a general surgeon and ensure that an abdominal CT scan was performed. They opined that Dr. Gingrey acted negligently on Friday night and throughout the day Saturday by allegedly failing to physically examine Walker, by not recognizing from his review of Walker's medical chart on Saturday morning that she had acute appendicitis, and by not ensuring that an abdominal CT scan was performed during this period.

Following the appellants' completion of their case-in-chief, appellees moved for directed verdict. For purposes of their motion, appellees conceded that appellants had presented evidence creating a genuine issue of material fact over whether appellees had committed negligence and on the issue of damages. Instead, appellees argued that even assuming negligence on their part in the diagnosis and treatment of Walker, appellants had failed to come forward with evidence of cause-in-fact or proximate cause. Specifically, appellees

argued that appellants could not show cause-in-fact because there was no evidence that appellees' alleged negligence caused Walker's ruptured appendix or the loss of her unborn child. Second, appellees argued that appellants could not show proximate cause because the negligence of Dr. Smith and Dr. Novak during the course of Walker's second admission to the hospital was an intervening cause that superseded and cut off any negligence attributable to appellees as a matter of law. The trial court agreed with appellees and granted their motion to dismiss, stating on the record that "as a matter of law, I find that the acts or the inactions of the [appellees] were not the proximate cause, or at least the causal connection has not been shown."

On appeal, appellants contend that the trial court erred in granting appellees' motion for directed verdict because they presented evidence that, if accepted as true, would establish cause-in-fact and proximate cause.

> To recover in a medical malpractice case, a plaintiff must show not only a violation of the applicable medical standard of care but also that the purported violation or deviation from the proper standard of care is the proximate cause of the injury sustained. In other words, a plaintiff must prove that the defendants' negligence was both the cause in fact and the proximate cause of his injury.

(Citations omitted.) *Berrell v. Hamilton*, 260 Ga. App. 892, 896 (581 SE2d 398) (2003). See also *Atlanta Obstetrics &c. v. Coleman*, 260 Ga. 569 (398 SE2d 16) (1990). Each of these two components of causation will be discussed in turn.

1. Cause-In-Fact. In a medical malpractice case, causation must be established through expert testimony. *Zwiren v. Thompson*, 276 Ga. 498, 500 (578 SE2d 862) (2003).

> A mere showing of negligence without proof of causation is insufficient to withstand [a directed verdict]. Medical causation must be proved to a reasonable degree of medical certainty and cannot be based on mere speculation. "A bare possibility" of causing the injury complained of is not sufficient proof of causation as a matter of law.

(Citations omitted.) *Berrell*, 260 Ga. App. at 896. "Additionally, there can be no recovery for medical negligence involving an injury to the patient where there is no showing to any reasonable degree of medical certainty that the injury could have been avoided," had the physician complied with the applicable standard of care. (Citations and punctuation omitted.) *Anthony v. Chambless*, 231 Ga. App. 657, 659 (1)

(500 SE2d 402) (1998). Questions regarding causation "are peculiarly questions for the jury except in clear, plain, palpable and undisputed cases." (Citations and punctuation omitted.) *Horney v. Lawrence*, 189 Ga. App. 376, 377 (3) (375 SE2d 629) (1988).

Given these evidentiary standards, appellants were required to come forward with expert testimony that, if accepted as true, showed to a reasonable degree of medical certainty that if appellees had abided by the applicable standard of care, Walker would not have suffered her alleged physical and cognitive deficits and the loss of her fetus. We find that appellants came forward with some evidence of causation and thus were entitled to have a jury resolve the issue.

During the course of trial, appellants offered the testimony of Dr. Martin Evans, a general surgeon, as an expert in the evaluation and work-up of patients, including pregnant patients, with potential abdominal infections. Appellants also offered the testimony of Dr. Cyd Williams, an obstetrician practicing in Atlanta, as an expert in obstetrics and gynecology.[7]

At several points during his testimony, Dr. Evans testified to a reasonable degree of medical certainty that Walker had acute appendicitis "from the very beginning," Wednesday, June 20, 2001, as evidenced by the "entire sequence" of her clinical signs and symptoms reflected in her medical chart and the "shift to the left" seen in the complete blood study performed on Wednesday.

> DR. EVANS: [I]f one thinks about the process from Wednesday when she entered the hospital to Friday when she was discharged to . . . Friday night, that process absolutely fits appendicitis from the beginning, appendicitis in the middle, and now appendicitis infection that is overwhelming this patient.
> COUNSEL: And it's finally discovered two days later on Sunday?
> DR. EVANS: That she has a ruptured appendix with abscess, and she is sick as can be.

---

[7] In stating their medical opinions during trial, Dr. Williams, Dr. Evans, and Dr. Martin Tobin did not specifically state in response to each question that they were providing their opinion to a reasonable degree of medical certainty. However, appellants' experts were not required to use these magic words in rendering their opinions. *Anthony*, 231 Ga. App. at 659 (1). In any event, at the beginning of their testimony on direct examination, Dr. Williams, Dr. Evans, and Dr. Tobin agreed that whenever they stated an opinion at trial, they were stating their opinion to a reasonable degree of medical certainty, unless they specifically stated otherwise. Thus, whenever appellants' medical experts rendered a professional opinion without any qualification, it was with the understanding that their opinion was to a reasonable degree of medical certainty, a point which we have borne in mind in our discussion of appellants' expert testimony on causation.

Dr. Williams reached the same expert conclusion based on her review of the medical records.

> COUNSEL: Is it your opinion or do you have an opinion as to whether or not Kim Walker had early appendicitis on Wednesday?
> DR. WILLIAMS: Yes, it is my opinion that she did.

In turn, Dr. Martin Tobin, admitted as an expert in pulmonary critical care, stated several times during his testimony that it was his opinion to a reasonable degree of medical certainty that based on the signs and symptoms recorded in Walker's medical chart, Walker's appendix ruptured no earlier than 4:00 p.m. on Saturday, June 23, 2001.

> COUNSEL: Certainly your opinion here today . . . is that her appendix did not rupture any time [before] 4 p.m., true?
> . . .
> DR. TOBIN: Correct.
> COUNSEL: That this would be the absolute earliest, right?
> DR. TOBIN: Correct.

Moreover, Dr. Williams and Dr. Evans both testified that in their professional opinions, if appellees had complied with the applicable standard of care, appendectomy surgery would have been performed on Walker on Thursday or Friday, and, therefore, in light of Dr. Tobin's expert testimony, prior to the rupture of Walker's appendix. Specifically, Dr. Williams and Dr. Evans testified that if Dr. Giles, Dr. Klein, or Dr. Gingrey had complied with the standard of care and timely ordered a follow-up blood study prior to Walker's initial discharge from the hospital on Friday morning, the blood study would have revealed a worsening abdominal bacterial infection, rather than a viral infection as previously diagnosed.[8] Both experts further testified that having obtained the results of a follow-up blood study, appellees would have had a duty to consult with a general surgeon and ensure that an abdominal CT scan was performed in order to determine the exact type of abdominal bacterial infection suffered by Walker.

Finally, Dr. Evans testified that because of the high accuracy rate of abdominal CT scans, it was his professional opinion that such a

---

[8] Walker's experts reached this conclusion by comparing the initial blood study performed on Walker on Wednesday evening with the blood study eventually performed early Saturday morning by order of the emergency room physician, and then deducing from them what a blood study taken between those two points in time would have revealed.

scan clearly would have revealed Walker's acute appendicitis, leading to immediate emergency surgery on Thursday or Friday, rather than to her discharge on Friday morning.

> COUNSEL: What would be the statistical — percentage wise, what would be the accuracy rate of a CT . . . ?
> DR. EVANS: Ninety-six percent. Some studies might be as low as ninety-four percent. But the number is pretty high.
> . . .
> COUNSEL: In your opinion, had a CT been done on Thursday and/or Friday, would surgery have ensued . . . either Thursday or Friday?
> DR. EVANS: Yes. Yes.

Based on this combined expert testimony, we conclude that appellants presented evidence creating a genuine issue of material fact over whether the rupture of Walker's appendix would have been prevented if appellees had properly complied with the standard of care during Walker's first admission into the hospital. Appellees suggest in their appellate brief that appellants must establish that their alleged medical negligence affirmatively caused Walker's appendix to rupture prior to her initial discharge on Friday morning. Appellees misstate the standard applicable in medical misdiagnosis cases. Appellants were only required to come forward with some evidence showing that if appellees had abided by the standard of care, the rupture of her appendix would have been avoided. *Anthony*, 231 Ga. App. at 659 (1). See also *Berrell*, 260 Ga. App. at 896; *Parrott v. Chatham County Hosp. Auth.*, 145 Ga. App. 113, 114 (243 SE2d 269) (1978). This appellants were able to do through the expert testimony that they offered at trial.

Appellees do not challenge appellants' further contention that they presented expert testimony showing to a reasonable degree of medical certainty that Walker's ruptured appendix caused her septic infection, which caused her to develop ARDS, which caused her to require mechanical ventilation, which caused her to have a stroke, leading to cognitive and physical deficits. However, appellees do contend that appellants failed to present any evidence of a causal link between Walker's ruptured appendix and the subsequent loss of her fetus.

After reviewing the record, we disagree. Dr. Williams testified about the effects that a ruptured appendix can have on a fetus:

> [O]nce the appendix has perforated, then the infection is loose in the abdomen. It causes an inflammatory process in the peritoneum, which is the lining of the abdominal cavity.

That can set up a seeding to the blood stream which can cause a mother to become septic. With that released infection in the abdomen, it irritates the uterus causing the uterus to then respond and there's a potential for premature labor and premature delivery of a fetus.

Dr. Williams opined that because of the threat it poses to a pregnancy, intra-abdominal infections "[m]ost definitely [require] surgical intervention." Dr. Williams, who had reviewed Walker's medical records, went on to testify that it was her professional medical opinion that Walker's fetus in this case would have survived, had Walker's appendix been removed prior to rupture.

COUNSEL: Dr. Williams is it your opinion that had surgery taken place before rupture of Kim's appendicle abscess that their baby would have survived?
DR. WILLIAMS: Yes, that is my opinion.

Additionally, the medical records admitted at trial reflect that an obstetrical ultrasound of Walker's fetus was ordered by the emergency room physician early Saturday morning (prior to when Walker's appendix ruptured according to the expert testimony offered by Dr. Tobin), and Dr. Williams testified that the ultrasound reflected no acute findings at that time. It was not until later on early Sunday morning — in the window of time in which Dr. Tobin opined that Walker's appendix ruptured — that Walker's membranes ruptured, evidencing a pregnancy problem and leading Dr. Gingrey to note in his progress notes that a spontaneous miscarriage was "anticipate[d]."

The expert opinions provided by Dr. Williams, combined with the medical records introduced at trial when viewed in light of Dr. Tobin's expert testimony concerning the time line for when Walker's appendix ruptured, created a genuine issue of material fact as to whether the rupture of Walker's appendix caused the death of her fetus. Causation may be established by linking the testimony of several different experts. See *Sinkfield v. Oh*, 229 Ga. App. 883, 886-887 (2) (495 SE2d 94) (1997). Furthermore, whether or not a genuine issue of fact has been created with regard to causation must be determined in light of the evidentiary record as a whole. See id.

Accordingly, for all these reasons, we cannot say that appellants failed to create a genuine issue of fact as to whether appellees' alleged deviations from the standard of care caused Walker's physical and cognitive deficits and the loss of her fetus. To the extent that the trial court based its decision to grant a directed verdict on this ground, the trial court's decision was erroneous.

2. Proximate Cause. "The requirement of proximate cause constitutes a limit on legal liability; it is a policy decision that, for a variety of reasons, e.g., intervening act, the defendant's conduct and the plaintiff's injury are too remote for the law to countenance recovery." (Citation and punctuation omitted.) *Coleman*, 260 Ga. at 569.

> It is well settled that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent, intervening, act of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendant's acts, and which was sufficient of itself to cause the injury.

(Citations omitted.) *Black v. Ga. Southern & Fla. R. Co.*, 202 Ga. App. 805, 807 (1) (415 SE2d 705) (1992). However, it is equally well settled that proximate cause is generally an issue for the jury, and "there may be more than one proximate cause of an injury" in cases involving the concurrent negligence of several actors. *Atlanta Gas Light Co. v. Mills*, 78 Ga. App. 690, 695 (1) (51 SE2d 705) (1949). See also *Brown v. Starmed Staffing*, 227 Ga. App. 749, 755 (3) (490 SE2d 503) (1997) (physical precedent only).[9]

Here, the trial court granted appellees' directed verdict motion on proximate cause grounds after finding that the alleged medical negligence of Dr. Smith and Dr. Novak following Walker's second admission into the hospital constituted an intervening act that superseded and cut off any negligence committed by appellees as a matter of law. After reviewing the record in this case and the relevant case law, we disagree for several reasons.

Most significantly, resolution of the issue of intervening cause in this case is controlled by *Schriever v. Maddox*, 259 Ga. App. 558 (578 SE2d 210) (2003). In *Schriever*, the plaintiff suffered from a ruptured biceps tendon that an emergency room physician misdiagnosed and failed to treat. The next day, the plaintiff saw a different physician, who also misdiagnosed the plaintiff's condition. In addressing intervening cause, we held that the second physician's negligence actions "were not intervening, but were very similar to [the first physician's] actions and therefore merely compounded (but did not cut off) the initial negligence" of the first physician. Id. at 561 (2) (b). See also *Coleman v. Atlanta Obstetrics &c.*, 194 Ga. App. 508, 510-511 (1) (390

---

[9] Contrary to appellees' argument, a finding of concurrent negligence by several parties does not require a finding that there was concert of action between the parties. See *Gault v. Nat. Union Fire Ins. Co.*, 208 Ga. App. 134, 137 (3) (430 SE2d 63) (1993); *Gilson v. Mitchell*, 131 Ga. App. 321, 327 (205 SE2d 421) (1974), aff'd, *Mitchell v. Gilson*, 233 Ga. 453 (211 SE2d 744) (1975).

SE2d 856), aff'd, *Atlanta Obstetrics &c. v. Coleman*, 260 Ga. 569 (398 SE2d 16) (1990) (medical malpractice committed by physician that followed initial physician's malpractice did not constitute an intervening cause).[10] The binding precedent of *Schriever* requires reversal of the trial court's finding that, as a matter of law, the alleged negligence of Dr. Smith and Dr. Novak served as an intervening cause cutting off all liability to appellees.[11]

Likewise, previous Georgia cases permitting joint and several liability of two or more physicians who independently treat a patient at different times but together cause an indivisible injury to the plaintiff implicitly reject the notion that a first-treating physician is absolved of legal responsibility as a matter of law. See *Gilson*, 131 Ga. App. at 331. See also *Rossi v. Oxley*, 269 Ga. 82, 83 (2) (495 SE2d 39) (1998) (noting that when a patient is treated by her own doctor but also by an on-call hospital doctor, the "patient may look to her own doctor for liability when the independent negligent acts of both doctors cause [the patient's] indivisible injury") (footnote omitted).

Furthermore, the trial court's finding was erroneous because the liability of a *tortfeasor* whose actions started the chain of events leading to the victim's injury is superseded and cut off only "if there intervened between the act and the injury a distinct, successive, *unrelated*, efficient cause of the injury." (Citations and punctuation omitted; emphasis in original.) *Coleman*, 194 Ga. App. at 511 (1). Here, the alleged misdiagnosis and mistreatment of Walker by Dr. Smith and Dr. Novak on Saturday and Sunday that contributed to her injuries was not unrelated to appellees' previous alleged failure to properly diagnose and treat Walker. Rather, the treatment provided to Walker by Dr. Smith and Dr. Novak on Saturday and Sunday was "reasonably required" because of appellees' alleged failure to properly diagnose Walker's appendicitis on Thursday or Friday and have emergency surgery performed on one of those two dates. See id.

---

[10] Several foreign jurisdictions have reached a similar result in cases where medical malpractice by one physician was followed by malpractice of one or more other physicians. See, e.g, *Looney v. Davis*, 721 S2d 152 (Ala. 1998); *Fish v. Los Angeles Dodgers Baseball Club*, 56 Cal. App.3d 620 (1976); *Elosiebo v. State*, No. E2003-02941-COA-R3, 2004 WL 2709206 (Tenn. Ct. App. Nov. 29, 2004); *Solomon v. Hall*, 767 SW2d 158 (Tenn. Ct. App. 1988).

[11] Appellees rely on *McQuaig v. McLaughlin*, 211 Ga. App. 723 (440 SE2d 499) (1994) in support of their position that the negligence of Dr. Smith and Dr. Novak constituted an intervening cause as a matter of law. In *McQuaig*, the nurse defendants allegedly failed to report the patient's early signs and symptoms to the defendant doctor in violation of the nursing standard of care. Id. at 726 (1) (b). However, there was undisputed evidence that the doctor was fully aware of the signs and symptoms of the patient in time to properly diagnose and treat the patient, despite the negligence of the nurses. Id. Thus, the patient's injuries would not have been avoided, even if the nurses had abided by the standard of care. As such, the plaintiff patient could not show that the nurses' negligence was a cause in fact of her injuries. Compare *Brown*, 227 Ga. App. at 754-755 (3). In contrast, in the present case, appellants presented evidence of cause-in-fact, as previously discussed.

Hence, the present case involves allegations of "malpractice in response to malpractice," rendering the grant of a directed verdict to appellees on the ground of intervening cause inappropriate. See id.

The trial court's finding also was erroneous because "[t]he rule that an intervening act may break the causal connection between an original act of negligence and injury to another is not applicable if the nature of such intervening act was such that it could have reasonably been anticipated or foreseen by the original wrongdoer." (Citation and punctuation omitted.) *Coleman*, 194 Ga. App. at 510 (1). In *Coleman*, we reversed a trial court that had granted a judgment notwithstanding the verdict to a physician who committed malpractice based on the conclusion that malpractice by a subsequent physician constituted an intervening cause. Id. at 510-511 (1). In reversing the trial court, we addressed the issue of foreseeability:

> A negligent actor is liable not only for the injury caused by his own acts but is also liable for any additional harm resulting from the manner in which reasonably required medical services are rendered. See Restatement (2d) of Torts, § 457 (1965). A defendant may be liable not only for all damages resulting directly from his negligent act "but also for all damage resulting from the improper or unskillful treatment of the injuries by the physician." *Smith v. Hardy*, 144 Ga. App. 168 (16) (240 SE2d 714) (1977).

Id. at 510 (1). Accordingly, a jury would be entitled (although not required) to conclude that it was reasonably foreseeable to the appellees that the treatment provided to Walker by Dr. Smith and Dr. Novak on Saturday and Sunday — made necessary by appellees' failure to diagnose and have Walker's appendicitis properly treated on Thursday or Friday — would be rendered in a negligent manner. See id. See also *Smith*, 144 Ga. App. at 174 (16).

Appellees contend that the subsequent malpractice of Dr. Smith and Dr. Novak on Saturday and Sunday was not foreseeable as a matter of law because two of appellants' experts, Dr. Williams and Dr. Evans, both stated on cross-examination that it would not have been foreseeable to appellees that the general surgeons were going to be negligent. We cannot agree.

> In order that a party may be liable in negligence, it is not necessary that he should have contemplated or even been able to anticipate the particular consequences which ensued, or the precise injuries sustained by the plaintiff. It is sufficient, if, by exercise of reasonable care, the defendant might have foreseen that some injury would result from his

act or omission, or that consequences of a generally injurious nature might have been expected.

(Citations omitted.) *Coleman*, 194 Ga. App. at 510 (1). Moreover, the ultimate resolution of whether a subsequent act was foreseeable for proximate cause purposes involves a public policy determination that is best left to a jury except in rare cases. *White v. Rolley*, 225 Ga. App. 467, 470 (2) (484 SE2d 83) (1997); *Black*, 202 Ga. App. at 807 (1).[12]

Finally, our conclusion is fortified by the Restatement (2nd) of Torts § 452, which has been relied upon by this Court as persuasive authority. See *J.C. Lewis Motor Co. v. Simmons*, 128 Ga. App. 113, 114-115 (1) (195 SE2d 781) (1973). Section 452 provides that "the failure of a third person to act to prevent harm to another threatened by the actor's negligent conduct is not a superseding cause of such harm," except where "the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to [the] third person." Restatement (2nd) of Torts § 452 (1), (2) (1965).

At trial, appellants presented expert testimony that the duty to properly diagnose and treat Walker and her fetus did not completely shift from appellees to Dr. Smith and Dr. Novak once the latter became involved in Walker's case. In particular, Dr. Williams and Dr. Evans testified that obstetricians and general surgeons routinely work together as "co-manager[s]" and "team members" to work-up and evaluate pregnant patients with abdominal infections. Both experts testified that there is no difference in the standard of care for a general surgeon and obstetrician regarding the evaluation, recognition, work-up, and diagnosis of a pregnant patient with an abdominal infection.

> COUNSEL: Is there any difference, Doctor, between the duty owed by — under the appropriate standard of care by a general surgeon and OB-GYN with regard to the duty to work up a pregnant patient with — who has signs and symptoms of a possible abdominal bacterial infectious process?
> DR. EVANS: There is no difference. Both of them would be potentially called upon to evaluate that patient.

---

[12] Citing *Overstreet v. Nickelsen*, 170 Ga. App. 539, 542-543 (4) (317 SE2d 583) (1984), appellees also argue that the negligence of Dr. Smith and Dr. Novak was not foreseeable as a matter of law because there is a presumption under Georgia law that medical services are performed in an ordinary skillful manner. The presumption in question does not speak to the issue of foreseeability as it relates to proximate cause. Rather, *Overstreet* and other cases have referred to the presumption in the context of discussing *the standard of care* applicable in medical malpractice cases and the burden that a plaintiff must meet in order to show a deviation from that standard. See id.; *Kenney v. Piedmont Hosp.*, 136 Ga. App. 660, 664 (3) (222 SE2d 162) (1975).

. . .

COUNSEL: Is there any difference in the way a general surgeon works up a patient for a potential bacterial abdominal infection versus what an OB-GYN would do to work up a patient for that?

DR. WILLIAMS: No. The work up is not unique to each discipline of medicine.

Both experts also testified that an obstetrician has an independent duty not to simply defer to a general surgeon, but rather to ensure that all proper diagnostic tests are performed on his sick pregnant patient and fetus which the obstetrician reasonably believes are necessary and appropriate (which in this case would have included follow-up blood studies and an abdominal CT scan, in their view). Moreover, both experts opined that if an obstetrician determines that surgery for his pregnant patient and fetus is needed, the obstetrician has a duty to take all available steps to ensure that the surgery is done in a timely manner and cannot abandon the patient and fetus to a general surgeon. In this regard, when asked whether in her opinion "the standard of care allow[s] any physician and particularly an OB-GYN to stand by and watch another physician not meet the standard of care," Dr. Williams answered "No."

Given this record evidence, we find that appellants created a genuine issue of material fact over whether the duties owed to Walker by appellees were concurrent and overlapping with the duties owed to her by Dr. Smith and Dr. Novak once the latter became involved in her care. As such, the causation principles set forth in Restatement (2nd) of Torts § 452 (1), (2) support our conclusion it was not appropriate for the trial court to find as a matter of law that the alleged negligence of Dr. Smith and Dr. Novak constituted an intervening act which superseded any negligence committed by appellees.[13]

For these reasons, the trial court erred in its finding as a matter of law that the alleged negligence of appellees did not proximately cause Walker's injuries. The trial court should have submitted the case to a jury to determine whether Dr. Smith and Dr. Novak were solely responsible for Walker's injuries, or whether in this case there was "more than one proximate cause." *Atlanta Gas Light Co.*, 78 Ga. App. at 695 (1).

---

[13] See also *Jenkins v. Payne*, 465 SE2d 795, 797-799 (Va. 1996) (noting that plaintiff presented expert testimony that gynecologist and family practice physician had the same duty of care under circumstances of the case, precluding determination by trial court that, as a matter of law, either physician's negligence constituted the sole proximate cause of the patient's injuries).

In conclusion, we emphasize that appellees highly dispute appellants' version of the facts, including but not limited to the specific symptoms manifested by Walker and their severity; whether Walker had appendicitis prior to her first discharge from the hospital; whether appellees performed physical examinations of Walker while she was in the hospital; whether Dr. Gingrey visited Walker's hospital room and spoke with her about her condition; and the extent to which appellees were provided information and assurances from Dr. Smith and Dr. Novak concerning Walker's condition. Moreover, it is clear that appellees' experts, had they testified, would have disagreed over what could have been deduced from Walker's initial blood study and the role that obstetricians are required to play in a pregnant patient's care once a general surgeon has been consulted on an abdominal infection. A jury, after considering all of the evidence, may exonerate appellees from any liability in this case. However, in reviewing a motion for directed verdict, we must view the evidence in the light most favorable to the nonmovant, and such a verdict "may not be granted because the strength or weight of the evidence [may appear to be] on one side." *Coleman*, 260 Ga. at 570. "Before the trial court can direct a verdict for the movant, he must find from the evidence that there is *no evidence of any kind* supporting the nonmovant's position." (Emphasis in original.) *Knight*, 262 Ga. App. at 223. That was not the case here.

*Judgment reversed. Blackburn, P. J., and Miller, J., concur.*

DECIDED NOVEMBER 18, 2005 —
RECONSIDERATION DENIED DECEMBER 5, 2005 — 

*Schklar, Wright & Henderson, Robert U. Wright, Edward C. Henderson, Jr.*, for appellants.

*Greenberg Traurig, Lori G. Cohen, Michael J. King*, for appellees.