## A07A0811. AMU et al. v. BARNES et al.

(650 SE2d 288)

BERNES, Judge.

In 2000, after experiencing repeated episodes of rectal bleeding, Wilbert Barnes saw his personal physician, Dr. Chuckwudi Bato Amu, who diagnosed him with hemorrhoids. In 2004, Barnes learned that he had terminal colon cancer. Barnes and his wife then brought this medical malpractice action against Dr. Amu and his medical practice based on the alleged failure to properly diagnose Barnes' medical condition. After a six-day trial, the jury returned a verdict in favor of Barnes. On appeal, Dr. Amu argues that Barnes' claim should have been dismissed because the statute of limitation had expired and because the negligence of Barnes and another treating physician were the intervening and superseding causes of Barnes' injury as a matter of law. We disagree and affirm.

"Where a jury returns a verdict, the same must be affirmed on appeal if there is any evidence to support it, and the evidence is to be construed in a light most favorable to the prevailing party with every presumption and inference in favor of sustaining the verdict." (Citation and footnote omitted.) *R. O. C. v. Estate of Bryant*, 279 Ga. App. 652, 653 (1) (632 SE2d 429) (2006). So viewed, the evidence presented at trial reflects that on January 12, 2000, Barnes made an appointment and saw his primary care physician, Dr. Amu, because he had been passing bright red blood from his rectum with his bowel movements over the previous week. Barnes was not experiencing any other symptoms.

After speaking with Barnes about his rectal bleeding, Dr. Amu diagnosed the cause of Barnes' bleeding as internal hemorrhoids and prescribed a suppository to relieve any discomfort. According to Barnes, Dr. Amu did not perform a visual inspection of his anus or a digital rectal exam prior to diagnosing him with hemorrhoids. Dr. Amu's physician records for the January 12 appointment likewise do not note that a physical exam was ever performed on that date. Additionally, Dr. Amu did not recommend or schedule any additional procedures for Barnes, such as a colonoscopy or sigmoidoscopy,[1] in order to confirm the diagnosis. Nor did Dr. Amu recommend to Barnes

---

[1] The expert gastroenterologist called by Barnes described a colonoscopy as involving "an examination of the entire colon or large intestine using a long flexible tube that has a light on it and a TV camera that [is] insert[ed] into the rectum and advance[d] all through the colon to look inside." He further testified that a sigmoidoscopy involves a similar procedure but "looks at only the lower 25 to 33 percent of the colon."

that he return for a follow-up office appointment to specifically revisit the rectal bleeding issue.[2]

Barnes did not fill the prescription for suppositories, but within two weeks the bleeding completely stopped. Barnes testified that because the bleeding had stopped and Dr. Amu "had put [his] mind at ease by telling [him] it was hemorrhoids," he did not see a need to make a follow-up appointment with Dr. Amu or otherwise pursue the matter any further. In fact, Barnes never returned to Dr. Amu after the January 12, 2000 appointment.

In October 2002, Barnes began seeing a new primary care physician, Dr. Bruce Ramsdell. Over the course of 2002-2003, Barnes had five appointments with Dr. Ramsdell, none of which revealed any problems with his colon. During this period, Dr. Ramsdell did not recommend or schedule a colonoscopy for Barnes, although expert medical testimony at trial established that the recommended practice is for all patients over the age of 50 to have one performed in order to screen for colon cancer.

In the spring of 2004, Barnes began having episodes of abdominal cramping, nausea, and dizziness, which at first he attributed to food poisoning. Then, in approximately June 2004, Barnes began having much more severe episodes of abdominal cramping, nausea, and dizziness, accompanied by a recurrence of rectal bleeding. Barnes made an appointment with Dr. Ramsdell on July 9, 2004 to address these recent abdominal problems. Dr. Ramsdell performed a guaiac test to determine whether there was any blood in Barnes' stool, which came back positive. Dr. Ramsdell also ordered that blood work be performed, which showed that Barnes was severely anemic. Based on these test results, Dr. Ramsdell referred Barnes to a gastroenterologist.

The gastroenterologist performed a colonoscopy on August 2, 2004. The colonoscopy revealed a large tumor that was almost completely blocking Barnes' rectum. A biopsy confirmed that the tumor was cancerous. Although the tumor subsequently was removed from Barnes' colon, additional testing showed that the cancer had spread extensively into his surrounding lymph nodes and liver. Because Barnes' cancer had spread into a surrounding organ, it was classified as stage IV colon cancer, which is terminal. Normal life expectancy for stage IV colon cancer, even with chemotherapy, is

---

[2] At trial, Dr. Amu testified to a different version of events surrounding the January 12 appointment. But, "[i]t is the function of the jury to resolve conflict in testimony; this Court will not substitute its judgment for that of the jury and will neither weigh evidence nor determine witness credibility." (Citations omitted.) *Camp v. EMSA, Ltd.*, 238 Ga. App. 482, 484 (518 SE2d 482) (1999).

approximately two years, with no more than a ten percent chance of survival beyond five years.

On December 22, 2004, Barnes and his wife filed the instant medical malpractice action against Dr. Amu in which they alleged that he had negligently misdiagnosed Barnes at the January 12, 2000 appointment. Dr. Amu asserted the affirmative defense of the statute of limitation in his answer and moved to dismiss the action on that ground at the pre-trial hearing. Dr. Amu argued at the hearing that the applicable two-year limitation period began to run on the date of Barnes' alleged misdiagnosis (January 12, 2000), and thus had expired prior to commencement of the case. The trial court denied Dr. Amu's motion. In reaching this result, the trial court reasoned that the limitation period did not begin to run until the date the symptoms of metastatic colon cancer manifested themselves to Barnes since the precise date of injury was difficult or impossible to determine, and that Barnes had presented evidence that symptoms did not manifest themselves until 2004.

At the ensuing trial, Barnes presented expert medical testimony that rectal bleeding in a middle-aged patient can be a sign of early colon cancer, and so colon cancer must be made part of the differential diagnosis.[3] Thus, according to Barnes' experts, if a 48-year-old patient presents with complaints of rectal bleeding, the standard of care requires a visual inspection of the interior of the rectum and colon in order to rule out the possibility of colon cancer. Barnes' experts opined that in order to obtain such a visual inspection, the treating physician should have a sigmoidoscopy or colonoscopy performed on the patient shortly following the initial office appointment. They testified that one of these two procedures should be performed, even if the physician's initial rectal exam reveals hemorrhoids, in order to rule out the presence of a more serious growth in the colon.

Given this standard of care, Barnes' experts opined that Dr. Amu should have had a sigmoidoscopy or colonoscopy performed on Barnes within a few months of the January 12 appointment. They further opined to a reasonable degree of medical certainty that if Dr. Amu had complied with the standard of care, the visual inspection of the colon would have revealed either a pre-malignant polyp or a very early

---

[3] "[A] differential diagnosis is a list of possibilities that a physician comes up with when presented with a clinical picture," which is then followed by "a series of diagnostic tests designed to rule out the more likely possibilities. Physicians then work through this process continually assessing the results of tests and determining what additional tests are indicated until they discover the actual problem." *Cherry v. Schwindt*, 262 Ga. App. 48, 48-49 (584 SE2d 673) (2003).

malignancy that had not yet spread to the lymph nodes and liver, which could have been successfully removed surgically without any further complications.[4]

Following Barnes' case-in-chief, Dr. Amu moved for a directed verdict on the ground that Barnes' failure to get routine and preventive medical care from the time after his January 12, 2000 appointment until he began seeing Dr. Ramsdell in October 2002 was the intervening cause of his injury as a matter of law. Dr. Amu also argued as part of his motion that Dr. Ramsdell's failure to have a colonoscopy performed on Barnes during 2002-2003, although Barnes was over the age of 50 at the time, was the intervening cause of Barnes' injury as a matter of law. The trial court denied the motion, but specifically charged and submitted to the jury the issue of proximate cause and intervening act.

Based on the evidence presented, the jury found in favor of Barnes and awarded him $800,000 in damages. The trial court subsequently denied Dr. Amu's motion for new trial or judgment notwithstanding the verdict, which again raised the issue of intervening cause. This appeal followed.

1. *Statute of Limitation.* Under OCGA § 9-3-71 (a), the two-year statute of limitation for medical malpractice cases starts to run "the date on which an injury or death arising from a negligent or wrongful act or omission occurred." Hence, "[t]he focus . . . is not the date of the negligent act but the consequence of the defendant's act[ ] on the plaintiff." (Citations and punctuation omitted.) *Staples v. Bhatti*, 220 Ga. App. 404, 405 (1) (469 SE2d 490) (1996).

> In most misdiagnosis cases, the injury begins immediately upon the misdiagnosis due to the pain, suffering or economic loss sustained by the patient from the time of the misdiagnosis until the medical problem is properly diagnosed and treated. The misdiagnosis itself is [coincident with the injury]. The general rule, therefore, is that in cases alleging failure to diagnose, the limitation period runs from the date of the misdiagnosis.

(Citations and punctuation omitted.) *Brown v. Coast Dental of Ga.*, 275 Ga. App. 761, 766 (1) (622 SE2d 34) (2005). This rule has been applied in many cases to foreclose a plaintiff's misdiagnosis claim, even where the plaintiff has no knowledge of his or her true medical condition during the limitation period. See, e.g., *Williams v. Devell R.*

---

[4] In contrast, Dr. Amu offered expert medical testimony that the growth rate of colon cancer is too variable to make such predictions.

*Young, M. D., P. C.*, 258 Ga. App. 821, 823-824 (575 SE2d 648) (2002); *Ford v. Dove*, 218 Ga. App. 828, 830-831 (3) (463 SE2d 351) (1995); *Frankel v. Clark*, 213 Ga. App. 222, 223-224 (444 SE2d 147) (1994); *Jones v. Lamon*, 206 Ga. App. 842, 844-846 (1) (426 SE2d 657) (1992).

Notably, however, we have held that there is a limited exception to this general rule which provides that "[w]hen a misdiagnosis results in subsequent injury that is difficult or impossible to date precisely, the statute of limitation runs from the date symptoms attributable to the new injury are manifest to the plaintiff." (Citations omitted.) *Walker v. Melton*, 227 Ga. App. 149, 151 (1) (b) (489 SE2d 63) (1997) (fracture developed into severe vertebral compression, failure of a spinal ligament, and destabilization of the spine). See also *Ward v. Bergen*, 277 Ga. App. 256, 258 (626 SE2d 224) (2006) (localized precancerous growths in breast developed into metastatic cancer of the breast and lymph nodes); *Zechmann v. Thigpen*, 210 Ga. App. 726, 729 (3) (437 SE2d 475) (1993) (painful eye disorder developed into neovascular glaucoma); *Whitaker v. Zirkle*, 188 Ga. App. 706, 707-708 (1) (374 SE2d 106) (1988) (malignant mole developed into metastatic melanoma). This is known as the "subsequent injury" or "new injury" exception. See *Bousset v. Walker*, 285 Ga. App. 102, 104 (2) (645 SE2d 593) (2007); *Canas v. Al-Jabi*, 282 Ga. App. 764, 783 (1) (b) (639 SE2d 494) (2006), cert. granted Feb. 26, 2007, *Al-Jabi v. Canas* (Case No. S07G0587).[5] In order for this exception to apply, not only must there be evidence that the plaintiff developed a new injury, but the plaintiff also must "remain[ ] asymptomatic for a period of time following the misdiagnosis." (Citation and punctuation omitted.) *Burt v. James*, 276 Ga. App. 370, 374 (623 SE2d 223) (2005).

Dr. Amu concedes that under the subsequent injury exception, Barnes' action was timely because it was filed within six months of the first manifestation of symptoms of Barnes' metastatic colon cancer. Instead, Dr. Amu asserts that this Court should disavow the subsequent injury exception because it is nothing more than a "discovery rule" in conflict with the intent of the General Assembly, as expressed in the plain wording of OCGA § 9-3-71 (a) requiring the limitation period to commence on the date when the injury arising from the negligent act or omission occurred.

---

[5] In *Canas*, this Court concluded that the subsequent injury exception did not apply under the facts of that case. 282 Ga. App. at 784-785 (1) (b). But, the Court went on to hold that if a patient continues in treatment with a doctor after an initial negligent misdiagnosis, and if the doctor stands by the misdiagnosis in a later appointment even after "the patient presents the doctor with a significant change in manifestations of his condition[s]," then "the injury from the new negligent act or omission cannot be deemed to have occurred any earlier than the date of the new misdiagnosis." Id. at 785 (1) (b). The Supreme Court of Georgia recently granted certiorari in *Canas* (Case No. S07G0587). The rule enunciated in *Canas*, however, is not at issue here.

We decline to disavow the subsequent injury exception, which has been part of our settled jurisprudence for almost 20 years and has been applied or referred to in myriad cases.[6] See, e.g., *Whitaker*, 188 Ga. App. 706. See also *Stafford-Fox v. Jenkins*, 282 Ga. App. 667, 679, n. 12 (639 SE2d 610) (2006) (Andrews, P. J., concurring specially) (listing examples of cases applying or referring to the exception). Contrary to Dr. Amu's characterization, the subsequent injury exception does not simply create a discovery rule in violation of OCGA § 9-3-71 (a). Under a discovery rule, a limitation period can conceivably begin to run at one of two points, either when the plaintiff discovers that negligence has occurred, or, more narrowly, when the plaintiff discovers that he or she has been injured. See generally *Canas*, 282 Ga. App. at 779 (1) (b) (noting four points at which a limitation period for a tort could conceivably begin to run, with two of the points involving an element of discovery by the plaintiff). In contrast, the subsequent injury exception applies at the first point that symptoms of the new injury manifest themselves, "even if the patient is not aware of either the cause of the pain or of the connection between the symptoms and the negligent act or omission." (Citation and punctuation omitted.) *Brown*, 275 Ga. App. at 766 (1). Nor does the exception simply create a "discovery of the injury" rule in misdiagnosis cases, since the plaintiff must also establish the development of a *new* injury arising *after* the misdiagnosis for the exception to apply. See *Burt*, 276 Ga. App. at 373-374 (exception did not apply because plaintiff failed to prove a subsequent new injury; instead, the evidence showed only the existence of an original injury that remained "fairly constant" over time); *Kane v. Shoup*, 260 Ga. App. 723, 724-725 (1) (580 SE2d 555) (2003) (exception did not apply when uncontroverted evidence showed that the alleged misdiagnosis merely delayed treatment of plaintiff's initial injury, without resulting in the development of any new, separate injuries).

Indeed, the focus on manifestation of symptoms is not for the purpose of tying the running of the limitation period to the plaintiff's subjective awareness or understanding of his or her condition. Rather, the focus on manifested symptoms is intended to serve as a straightforward analytic tool for identifying the date when the new injury actually arose, given the difficulty, if not impossibility, in many cases of accurately pinpointing that date, given that the new injury arises "at some time between the misdiagnosis and the correct diagnosis, when the patient [is] not experiencing symptoms." *Burt*, 276 Ga. App.

---

[6] The same arguments made by Dr. Amu for disavowal of the exception were made by Presiding Judge Andrews in his special concurrence in the recent case of *Stafford-Fox v. Jenkins*, 282 Ga. App. 667, 673-685 (639 SE2d 610) (2006). No other members of this Court joined that special concurrence.

at 373. See *Walker*, 227 Ga. App. at 151 (1). Hence, the subsequent injury exception does not disregard OCGA § 9-3-71 (a), but rather attempts to reconcile the statute's "date of injury" language with the fact that it is often difficult or impossible in the misdiagnosis context to calculate precisely when the new injury arose. The trial court thus committed no error in applying the subsequent injury exception in this case.

2. *Intervening Cause.* "[A] plaintiff cannot recover for medical malpractice, even where there is evidence of negligence, unless the plaintiff establishes by a preponderance of the evidence that the negligence either proximately caused or contributed to cause plaintiff harm." (Citations and punctuation omitted.) *Zwiren v. Thompson*, 276 Ga. 498, 500 (578 SE2d 862) (2003). Furthermore,

> [i]t is well settled that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent, intervening, act of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendant's acts, and which was sufficient of itself to cause the injury. However, it is equally well settled that proximate cause is generally an issue for the jury, and there may be more than one proximate cause of an injury in cases involving the concurrent negligence of several actors.

(Citations and punctuation omitted.) *Walker v. Giles*, 276 Ga. App. 632, 643 (2) (624 SE2d 191) (2005).

Here, Dr. Amu argues that the trial court should have directed a verdict in his favor because his liability was cut off as a matter of law by either of two separate intervening, superseding causes — the negligence of Barnes himself or the negligence of Dr. Ramsdell.[7]

> [I]n reviewing a motion for directed verdict, we must view the evidence in the light most favorable to the nonmovant, and such a verdict may not be granted because the strength or weight of the evidence may appear to be on one side. Before the trial court can direct a verdict for the movant, he must find from the evidence that there is *no evidence of any kind* supporting the nonmovant's position.

---

[7] For the same reasons, Dr. Amu argues that the trial court should have granted his motions for new trial and for j.n.o.v. Because we conclude that Dr. Amu was not entitled to a directed verdict for the reasons discussed infra, we likewise conclude that he was not entitled to the grant of his post-trial motions.

(Citations and punctuation omitted; emphasis in original.) *Walker*, 276 Ga. App. at 648 (2). Guided by these principles, we will address separately each alleged intervening cause.

(a) *Barnes' Own Alleged Negligence.* Dr. Amu contends that Barnes negligently failed to seek any routine and preventative medical attention after the misdiagnosis in January 2000 until he began seeing Dr. Ramsdell in October 2002. According to Dr. Amu, if Barnes had done so, the colon cancer would have been discovered. Relying upon *Eldred v. Blue Cross & Blue Shield of Ga.*, 274 Ga. App. 798 (619 SE2d 331) (2005), Dr. Amu asserts that Barnes' failure to seek routine medical care during this period was the proximate cause of his injury as a matter of law. We disagree.

*Eldred* stands for the proposition that a patient's own actions constitute an intervening cause as a matter of law *where the patient consciously ignores a problem and allows it to worsen.* See *Eldred*, 274 Ga. App. at 800. In *Eldred*, the plaintiff repeatedly failed to keep a series of medical appointments despite having been diagnosed with brain lesions and warned that this was a serious condition. Id. at 799. Accordingly, we held that "it [was] both clear and palpable that [plaintiff's] independent decisions were the cause of the worsening of her condition," cutting off any prior negligence by the defendant physician as a matter of law. Id. at 800.

Barnes' failure to seek routine medical treatment from January 2000 to October 2002, however, cannot be analogized to the plaintiff in *Eldred.* Construed in the light most favorable to Barnes, the evidence reflects that Barnes was never put on notice that he had any sort of ongoing serious medical problem that needed further evaluation and treatment. Rather, the evidence shows that Barnes was given a false sense of security about the status of his health, based on the fact that Dr. Amu had led him to believe that his rectal bleeding was caused by nothing more than hemorrhoids; never informed him that any follow-up procedures or tests were needed; and never advised him that a follow-up appointment was necessary to reevaluate the initial diagnosis. This false sense of security was compounded by the fact that the bleeding symptoms ended shortly after the January 12, 2000 appointment, reaffirming, in Barnes' mind, that the bleeding was a simple bout of hemorrhoids. And, when he did begin experiencing symptoms in 2004, Barnes went to Dr. Ramsdell for evaluation, resulting in the correct diagnosis of colon cancer. As such, the present case is factually dissimilar from what occurred in *Eldred.*[8]

---

[8] We also note that Barnes' failure to go out on his own during the 2000 to 2002 time period and have a colonoscopy performed did not serve as an intervening cause cutting off liability as

It is true that during Barnes' case-in-chief, Dr. Amu testified that Barnes had a previously scheduled routine semi-annual physical set for June 2000, and that he reminded Barnes at the January 2000 appointment that he needed to return for that physical. Dr. Amu further testified that if Barnes had attended that physical, he would have performed an in-office sigmoidoscopy, and that he had informed Barnes of this fact at the January 2000 appointment. The jury, however, was entitled to assign little or no weight to this testimony, since it was in conflict with other evidence presented at trial. See *Camp v. EMSA, Ltd.*, 238 Ga. App. 482, 484 (518 SE2d 482) (1999). Barnes testified that he had no recollection of a June 2000 physical ever having been scheduled or of Dr. Amu mentioning it at the January 2000 appointment, and he further testified that Dr. Amu never mentioned having a sigmoidoscopy or other follow-up procedure performed during the January 2000 appointment. Moreover, Dr. Amu's live testimony was contradicted by his own deposition testimony in which he conceded that even if Barnes had attended the alleged June 2000 physical, he probably would not have had a colonoscopy or sigmoidoscopy performed, given the fact that Barnes would not yet have turned 50 and the rectal bleeding had stopped by that point. Given these multiple conflicts in the evidence, Dr. Amu's in-court testimony on these points could not serve as the basis for a directed verdict.

Under these circumstances, the trial court was not required to hold that Barnes' acts or omissions constituted an intervening proximate cause that cut off Dr. Amu's liability as a matter of law. Therefore, the trial court committed no error in denying Dr. Amu's motion for directed verdict on this ground and instead allowing the jury to resolve the issue.

(b) *Dr. Ramsdell's Alleged Negligence.* Dr. Amu also maintains that his liability was cut off as a matter of law by the alleged negligence of Dr. Ramsdell, Barnes' treating physician from 2002 to 2004. In this respect, Dr. Amu contends that Dr. Ramsdell's failure to have a colonoscopy performed on Barnes for the two years after he had turned 50 was the intervening cause of Barnes' injury, given that the standard of care requires that all patients at that age undergo that procedure. Again, we disagree.

> A negligent actor is liable not only for the injury caused by his own acts but is also liable for any additional harm resulting from the manner in which reasonably required

---

a matter of law. While a colonoscopy is now recommended by the medical community for all men and women over 50, Barnes testified that he was never told by any physician, including Dr. Amu, about this recommendation.

medical services are rendered. See Restatement (2d) of Torts, § 457 (1965). A defendant may be liable not only for all damages resulting directly from his negligent act "but also for all damage resulting from the improper or unskillful treatment of the injuries by the physician." *Smith v. Hardy*, 144 Ga. App. 168[, 173-174] (16) (240 SE2d 714) (1977).

*Coleman v. Atlanta Obstetrics &c.*, 194 Ga. App. 508, 510 (1) (390 SE2d 856) (1990), aff'd, *Atlanta Obstetrics &c. v. Coleman*, 260 Ga. 569 (398 SE2d 16) (1990). Applying these principles, we have held in several medical malpractice cases that malpractice by one or more successive physicians does not constitute an intervening cause as a matter of law that cuts off the original physician's liability. See *Walker*, 276 Ga. App. at 643-648 (2); *Coleman*, 194 Ga. App. at 510-511 (1); *Schriever v. Maddox*, 259 Ga. App. 558, 561 (2) (b) (578 SE2d 210) (2003). The same rule applies and squarely controls in this case. This, too, is a case where "the injury was the result of malpractice in response to malpractice." *Coleman*, 194 Ga. App. at 511 (1).

Dr. Amu argues that the present case is distinguishable from the cases cited above because the duty to prevent harm to Barnes allegedly shifted in its entirety to Dr. Ramsdell when he became Barnes' personal physician in October 2002. In support of his argument, Dr. Amu relies upon Restatement (2d) of Torts, § 452 (2) (1965), which provides:

> Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause.

See also *Walker*, 276 Ga. App. at 646-647 (2) (discussing section 452). Section 452 (2), however, does not cut off liability as a matter of law in medical malpractice cases where, as here, the physicians at issue were acting "with no express or implied agreements to assume any responsibilities of the other[ ]," such that "their only connection was that they had both negligently examined the same [patient]." (Citation and punctuation omitted.) *Looney v. Davis*, 721 S2d 152, 161 (III) (Ala. 1998). See also *Fish v. Los Angeles Dodgers Baseball Club*, 56 Cal. App.3d 620, 635-642 (1976). Compare *Siggers v. Barlow*, 906 F2d 241 (6th Cir. 1990) (initial physician's liability for failing to notify patient of misdiagnosed x-ray was cut off under section 452 (2) based on an implied agreement to shift responsibility to the successive physician; both the initial and successive physician were employed in a similar capacity at the same hospital emergency room, and internal

hospital procedures expressly stated that it was the responsibility of the successive physician to notify the patient of the x-ray). In cases where no such express or implied agreement existed between the physicians, the issue of whether responsibility shifted to the successive physician "because of lapse of time or otherwise" is best left to the jury. Accordingly, section 452 (2) did not cut off Dr. Amu's liability as a matter of law.

Finally, Dr. Amu relies upon *Meiners v. Fortson & White*, 210 Ga. App. 612 (436 SE2d 780) (1993), a legal malpractice case, to support his argument that the evidence demanded a finding that the alleged negligence of Dr. Ramsdell constituted an intervening cause. *Meiners* involved an allegation of negligent failure to perfect service. Id. at 612-613. The plaintiff had originally retained the defendant law firm, but later fired the firm and retained other counsel. Id. at 612. When the previously hired attorney learned that the plaintiff had retained new counsel, he contacted the second attorney and explicitly advised him that the opposing party had not yet been served. Id. Given these uncontroverted facts, we held that the second attorney's subsequent negligence in failing to perfect service, despite having been explicitly advised of the service problem, was not reasonably foreseeable and thus cut off the defendant's liability as a matter of law. Id. at 613.

*Meiners* clearly is distinguishable. That case would be on point if Dr. Amu had informed Dr. Ramsdell of Barnes' prior rectal bleeding episodes and of the fact that no visual inspection procedure had been performed. It is undisputed that Dr. Amu never did so. His reliance upon *Meiners* thus is misplaced.

For these combined reasons, the jury was entitled to hear and resolve whether Dr. Ramsdell's acts or omissions were the intervening cause of Barnes' injury. It follows that the trial court properly denied Dr. Amu's motion for directed verdict and allowed the case to proceed to trial.

*Judgment affirmed. Blackburn, P. J., and Ruffin, J., concur.*

DECIDED JULY 2, 2007 —
RECONSIDERATION DENIED JULY 23, 2007 —

*Christopher J. McFadden, Bobby-Thompson C. Aniekwu, Susan M. Garrett*, for appellants.

*Warshauer, Poe & Thornton, James M. Poe*, for appellees.