A06A1337. CANAS v. AL-JABI et al.
A06A1338. KAMINER v. CANAS.
A06A1339. AL-JABI v. CANAS.
A06A1340. BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA v. CANAS.
A06A1341. MCG HEALTH, INC. v. CANAS.
(639 SE2d 494)

ELLINGTON, Judge.

After a hearing, the Superior Court of Glynn County granted in part and denied in part motions for summary judgment filed in Derek Canas's action against Ayman Al-Jabi, M.D., Sharon J. Kaminer, M.D., the Board of Regents of the University System of Georgia d/b/a Medical College of Georgia Hospitals and Clinics ("the Board"), and MCG Health, Inc. ("MCGHI").[1] The trial court granted summary

---

[1] When Derek Canas was seventeen years old, his parents filed this action on his behalf, initially against the two individual doctors. After Canas reached the age of majority, the trial court substituted Canas as the party plaintiff, and he now proceeds on his own behalf.

judgment in favor of the defendants below "on all claims for medical malpractice where the alleged negligent or wrongful act or omission occurred more than 5 years before the date on which this action was brought" and denied the motions on all other medical malpractice claims. In the same order, the trial court also denied the defendants' various motions to disqualify Canas's expert witnesses.

In Case No. A06A1337, Canas appeals the partial grant of summary judgment. Canas's direct appeal allowed the defendants to file cross-appeals of the trial court's interlocutory and evidentiary rulings.[2] In Case No. A06A1338, Kaminer appeals the partial denial of summary judgment and the order denying the motions to disqualify Canas's expert witnesses. In Case No. A06A1339, Al-Jabi appeals the partial denial of summary judgment. In Case No. A06A1340, the Board appeals the partial denial of summary judgment and the order denying the motions to disqualify Canas's expert witnesses. In Case No. A06A1341, MCGHI appeals the partial denial of summary judgment.[3] For the reasons that follow, we affirm.

Viewed in the light most favorable to Canas,[4] the record reveals the following facts.[5] At his birth on November 1, 1984, Canas had a rare and serious heart defect, transposition of the great arteries with total anomalous pulmonary venous return. Two months later, surgeons at the Medical College of Georgia Hospital performed surgery to correct the defect. During and after the surgery, Canas received multiple transfusions of whole blood and blood products. Before he was discharged from the hospital after the initial surgery, Canas's blood tests showed anomalies which could indicate a problem with his immune system. Also before he was discharged, Canas developed a complication which required the implantation of a pacemaker. Because of his heart surgery and pacemaker, Canas required ongoing cardiology care, including regular monitoring of the pacemaker's

---

[2] OCGA § 5-6-38.

[3] The undisputed evidence established that before July 1, 2000, the Board operated the MCG Hospital and Clinics and employed the hospital's doctors. Beginning on that date, MCGHI began operating the MCG Hospital and Clinics; the Board continued to employ the hospital's doctors. Accordingly, "the hospital" will refer to the Board and to MCGHI collectively when we discuss issues of hospital operation that embrace dates both before and after July 1, 2000.

[4] "On appeal from the grant of summary judgment [the appellate court] conducts a de novo review of the evidence to determine whether there is a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law." (Citation and punctuation omitted.) *Munroe v. Universal Health Svcs.*, 277 Ga. 861, 864-865 (2) (596 SE2d 604) (2004).

[5] In Division 3, infra, we affirm the trial court's order denying the defendants' motions to disqualify Canas's expert witnesses. Accordingly, this recitation of facts is drawn from all of the evidence in the record, including the affidavits and deposition testimony of Canas's expert witnesses and related documentary exhibits.

performance and periodic modification and replacement of the pace-maker and its components.

At the time of Canas's initial surgery, in January 1985, the medical community was aware that blood from HIV-infected donors had entered the collected blood supply. With no artificial substitute for blood, however, health care providers often had no alternative to transfusing patients with potentially contaminated blood and blood products. Not long after Canas's surgery, an HIV screening test for blood donors became available. In March 1985, just two weeks after Canas was discharged, the hospital stopped using untested blood for transfusions.

On March 20, 1987, two years after Canas's initial surgery and the hospital's subsequent decision not to transfuse patients with untested blood, the United States Department of Health and Human Services, Centers for Disease Control ("CDC"), issued a Morbidity and Mortality Weekly Report ("MMWR") which stated:

> Blood banking organizations in the United States have begun "look-back" programs to identify previous recipients of blood from donors who tested positive for HIV antibody after screening began. In one region, 70% of recipients identified through such a program had HIV antibody. However, look-back programs cannot identify all infected transfusion recipients because many infected donors may have refrained from donating or become too ill to continue to donate after HIV serologic testing of donors began.

Because "HIV-infected persons are at risk for developing AIDS or related conditions themselves and may transmit infection to others," the MMWR urged doctors to "consider offering HIV antibody testing to some patients who received transfusions between 1978 and late spring of 1985." On April 30, 1987, the CDC issued comprehensive guidelines for HIV antibody counseling and testing which formalized the recommendation about counseling transfusion recipients, as follows:

> Patients being evaluated for signs and symptoms of illness should be counseled about the diagnostic utility of HIV antibody tests, and testing should be recommended when it is judged to be clinically appropriate for diagnosis or to assist in patient management decisions. . . .

> Selected patients who received transfusions of blood or blood components between early 1978 and mid 1985 should be counseled about the potential risk of HIV infection and

should be offered antibody testing. . . . The decision by a physician to recommend counseling and HIV antibody testing to a person who has received transfusions should be based on the likelihood of infection in the recipient and the likelihood of subsequent transmission from that person to others. The risk of infection is greatest for persons who received large numbers of units of components and from blood collected in an area with a high incidence of AIDS during the few years before screening was initiated.

The American Association of Blood Banks ("AABB") and the American Red Cross publicly supported the CDC's position.

On June 24, 1988, the Presidential Commission on the Human Immunodeficiency Virus Epidemic issued its report, which recommended that "[a]s soon as is practically possible, but no later than July 1, 1989, agencies which license and certify health care facilities should make a condition for licensure a program to notify all recipients of blood or blood products since 1977 of their possible exposure to HIV." In June 1989, the Technical Advisory Task Force on Blood Resources of the American Hospital Association ("AHA") issued a report to its members titled, "Blood Issues Update re: Minimizing the Risk of Transfusion-Associated HIV Infection." In that report, the AHA questioned whether a nationwide individual notification program for all transfusion recipients would address the Presidential Commission's concerns. The AHA estimated that such a program would cost hospitals $900 million to $2 billion to trace and notify approximately 30 million recipients. The AHA suggested the following "legal considerations":

At this point, it is far from clear that hospitals which decline to institute notification programs necessarily would be held liable to or for recipients ultimately discovered to be infected. . . .

Hospitals electing to adopt or participate in a recipient notification program would not necessarily thereby increase their liability to HIV-infected recipients. On the other hand, however, individual or public communication of transfusion risk-related information could tend to increase the likelihood of suit or to advance the time of filing by recipients who learn during the program that they are HIV-infected. . . .

Although it is by no means clear at this time that hospitals have a legal "duty to warn" prior transfusion recipients (either generally or individually), . . . [h]ospitals voluntarily

choosing to assume responsibility for transmitting transfusion-related information likely would be held to a "reasonable-ness" standard. In other words, having instituted notification efforts, such hospitals presumably could be held liable for failure to exercise "due care" or make "prudent efforts" to design and implement a well thought-out program with a reasonable chance of meeting its objectives.

In this case, the Board did not implement a universal patient notification or "recall" program as recommended by the Presidential Commission; instead, it implemented a "donor look-back" program. In that program, if the hospital discovered that a past blood donor was HIV positive, then the hospital would identify all patients who had received that donor's blood or blood products and notify those patients of their possible exposure to HIV. There is no evidence the hospital ever learned that any of Canas's blood donors had been HIV positive. The hospital never contacted Canas or his family to notify them of Canas's possible exposure to HIV through the transfusions he received in January and February 1985.

In May 1991, when Canas was six years old, Kaminer, a pediatric cardiologist and Board employee, began providing his pediatric cardiology care at the hospital. By that time, Canas displayed numerous signs and symptoms consistent with HIV infection and pediatric AIDS, including stunted growth, severe dental caries which required ten tooth extractions in December 1990, herpetic gingivostomatitis (a viral gum disease), recurrent pneumonia, swollen lymph nodes, and repeated viral illnesses of obscure and undiagnosed etiology. When Kaminer began treating Canas, he measured 42.8 inches tall and weighed 37.3 pounds, in the lowest fifth percentile for boys his age.

In May 1993, when Canas was eight years old, Al-Jabi began providing his general pediatric medical care. Canas continued to display signs of pediatric AIDS. In August 1994, when Canas was nine years old, he was hospitalized for ten days with pneumonia. He had an elevated blood sedimentation rate, the cause of which was never identified. At that time he measured 48.7 inches tall and weighed 45.2 pounds.

When Kaminer saw Canas in August 1996 when he was 11 years old, he measured 49.6 inches tall and weighed 52.7 pounds. She did not see Canas again until February 2000, when he was 15 years old, measured 50.4 inches tall and weighed 59.1 pounds. As Kaminer later acknowledged, it is one thing to be small at age five or six, but quite another at age fifteen. In the interim, Canas had developed gastrointestinal problems, particularly recurrent and unexplained diarrhea. At the February 2000 examination, Kaminer noted that Canas was experiencing shortness of breath, wheezing, and tightness in his

chest. He was weak and lacked stamina; his tolerance for exercise was in the bottom tenth percentile for boys his age. Kaminer saw Canas four more times, the last time on February 15, 2001. According to Canas's parents, throughout Kaminer's treatment of Canas, she attributed Canas's growth delay to his congenital heart defect even though they asked if his failure to grow could be caused by something else. She never referred Canas to another specialist for evaluation of his stunted growth, recurrent viral illnesses, and oral sores and dental decay. Kaminer limited her care of Canas to the issue of his heart function.

Al-Jabi, Canas's pediatrician, continued to see Canas for his various illnesses through March 15, 2000 when, as Al-Jabi later conceded, the fifteen-year-old Canas had the appearance of a seven-year-old boy. Like Kaminer, Al-Jabi attributed Canas's stunted growth and frequent illnesses to his congenital heart defect and never referred him to another specialist for evaluation of those problems. According to Al-Jabi, HIV "wasn't on the radar screen" because of Canas's heart condition. Al-Jabi did not consider himself Canas's "primary care physician." Al-Jabi testified that he never performed any routine "yearly check-up" type physical examination on Canas because he only saw Canas when he was ill.

Around the time of Canas's last visit with Al-Jabi, Canas's difficulties with repeated bronchitis and pneumonia, wheezing and shortness of breath had become so severe that Canas's parents took him to be evaluated by a pulmonologist. An x-ray of Canas's forearm, ribs, and hands revealed that at age fifteen he demonstrated the bony development of a six-year-old boy. Based on this, the pulmonologist referred Canas for evaluation by an endocrinologist. For several months beginning in July 2000, Canas received shots of human growth hormone but failed to respond. The endocrinologist then referred Canas to a pediatric immunology clinic.

In April 2001, at age 16, Canas was finally tested for HIV and was diagnosed with AIDS. Since beginning high activity antiretroviral drug therapy, Canas's viral load has dropped to undetectable levels, he has grown, and he suffers fewer infectious illnesses.

Canas filed suit against Al-Jabi and Kaminer on December 28, 2001. He filed an amended complaint, adding the Board and MCGHI as defendants, on February 7, 2003. Though the amended complaint is divided into five counts, Canas asserts two main theories of recovery. First, Canas claims that Al-Jabi and Kaminer committed medical malpractice, and asserts a derivative claim under the doctrine of respondeat superior against the Board as Kaminer's employer. Second, Canas claims the Board and MCGHI (as the operators of the hospital) and Kaminer (as an agent of the hospital) failed to discharge a duty to notify patients who had received transfusions at

the hospital between 1978 and the spring of 1985 that their transfusions with untested blood and blood products might have exposed them to HIV and to advise them to be tested. Canas contends that the acts forming the basis of this "administrative failure to warn" claim did not involve medical judgment and thus the claim sounds in ordinary negligence, not in medical malpractice.

All of the defendants below filed motions for summary judgment. The trial court granted summary judgment in favor of the defendants "on all claims for medical malpractice where the alleged negligent or wrongful act or omission occurred more than 5 years before the date on which this action was brought." The trial court specifically denied the motions for summary judgment "on all medical malpractice claims where the injury occurred within 2 years of the date this action was filed and the negligent or wrongful act or omission that caused the injury occurred within 5 years of the date this action was filed." In the same order, the trial court denied the defendants' various motions to disqualify Canas's expert witnesses. In a subsequent order, the trial court made explicit a legal conclusion that was implicit in the summary judgment order, specifically that the medical malpractice statute of limitation and statute of repose, OCGA §§ 9-3-71 and 9-3-73, do not violate the due process or equal protection clauses of the United States or Georgia constitutions.[6]

1. All of the parties challenge the trial court's ruling on the appellees' motions for summary judgment as to Canas's claim for medical malpractice, as set out in Count 1 of his amended complaint.

(a) Statute of Repose

Under OCGA § 9-3-71 (b), no action for medical malpractice may be brought more than five years "after the date on which the negligent or wrongful act or omission occurred." Subsection (b) "is intended to create a five-year statute of ultimate repose and abrogation." OCGA § 9-3-71 (c).

Canas contends Al-Jabi, Kaminer, and the Board are not entitled to judgment as a matter of law on the basis of Georgia's five-year medical malpractice statute of repose as to any aspect of his malpractice claim. Canas contends the medical malpractice statutory repose period is tolled until the injured person reaches the age of majority. If the repose period is not tolled, Canas contends the statute is unconstitutional in that it denies minors due process, equal protection, and access to the courts.

---

[6] Canas directed his appeal to the Supreme Court of Georgia on the basis of the trial court's constitutional rulings. The Supreme Court subsequently transferred the appeal and cross-appeals to this Court. See Division 1 (a), infra.

In alternative arguments, Canas contends that he filed his complaint within five years of the statute's trigger date, "the negligent or wrongful act or omission," specified in OCGA § 9-3-71 (b). First, Canas contends that the date of the negligent or wrongful act or omission in a misdiagnosis case can be no earlier than the date the health care provider's treatment of the patient ends or the date the patient receives the correct diagnosis. Second, Canas contends that the date on which a negligent or wrongful act or omission occurs in cases of latent medical negligence can be no earlier than the discovery of the act or omission by the patient (or by the parents of a minor). Finally, Canas contends that under the doctrine of equitable estoppel the appellees are precluded from asserting a statute of repose defense by their fraudulent concealment of his HIV infection.

Al-Jabi, Kaminer, and the Board contend, on the other hand, that the alleged negligent or wrongful act or omission that caused Canas's injury occurred more than five years before the date this action was filed and, therefore, that the trial court erred in granting only partial summary judgment on Canas's malpractice claim.[7] Generally, these appellees contend that in cases of an alleged misdiagnosis, such as this case, the date on which the negligent act or omission occurs is the date the physician first failed to make the correct diagnosis. According to Canas's own experts, Al-Jabi and Kaminer should have recognized Canas's symptoms of pediatric AIDS no later than 1994, when he was ten years old. Accordingly, these appellees contend, any negligent or wrongful act or omission occurred by the end of 1994, and Canas's action, filed seven years later, is precluded by the statute of repose.[8]

*The medical malpractice statutory repose period is not tolled until an injured minor reaches the age of majority or until the injured person discovers the negligent or wrongful act or omission.* "A statute

---

[7] In part, Canas asserted a theory of derivative liability against the Board under a theory of respondeat superior for the medical malpractice allegedly committed by its employee, Kaminer. In addition, Canas claims the Board and MCGHI are directly liable for their failure to warn. As we discuss in Division 2 (a), infra, the failure to warn claim is a claim for ordinary negligence not subject to the medical malpractice statute of repose and statute of limitation.

[8] In addition to these arguments, MCGHI contends it cannot be held derivatively liable for any malpractice committed by Kaminer because it never employed her or any other doctors. But the record shows that Canas does not seek to impose such liability. Canas did not allege in his complaint that MCGHI is liable as Kaminer's employer for her medical malpractice. Furthermore, Canas has confirmed in pleadings and arguments of counsel that he asserts liability against MCGHI only for the Board's failure to warn before July 1, 2000 (based on MCGHI's assumption of the Board's existing liabilities) and for MCGHI's own failure to warn beginning on that date when it took over operation of the hospital. See *MCG Health v. Nelson*, 270 Ga. App. 409, 411-412 (1) (606 SE2d 576) (2004) (MCGHI assumed responsibility for all liabilities involving the hospital that arose before or after the July 1, 2000 transfer date). Accordingly, there is no derivative claim against MCGHI for Kaminer's malpractice currently before the trial court.

of ultimate repose sets an ultimate limit on which injuries shall be actionable." (Citation and punctuation omitted.) *Esener v. Kinsey*, 240 Ga. App. 21, 22 (522 SE2d 522) (1999).

> A statute of ultimate repose delineates a time period in which a right may accrue. If the injury occurs outside that period, it is not actionable. A statute of repose stands as an unyielding barrier to a plaintiff's right of action. The statute of repose is absolute. . . . The statute of repose destroys the previously existing rights so that, on the expiration of the statutory period, the cause of action no longer exists.

(Citation and punctuation omitted.) *Simmons v. Sonyika*, 279 Ga. 378, 379 (614 SE2d 27) (2005). In enacting a statute of repose, which abolishes a cause of action after the allotted time, legislators exercise the right to "wipe the slate clean" after a fixed period of time. *Craven v. Lowndes County Hosp. Auth.*, 263 Ga. 657, 660 (2) (437 SE2d 308) (1993).

> [B]y definition, a statute of ultimate repose cannot be "tolled." . . . Unlike statutes of limitation, statutes of repose may not be tolled for any reason, as tolling would deprive the defendant of the certainty of the repose deadline and thereby defeat the purpose of a statute of repose. Whether by discovery, which delays the accrual of the action, or by infancy, incompetency, or fraud, which may toll the statute of limitation [as provided by statute[9]], nothing stops the abrogation of the action by the statute of repose; five years after the negligent or wrongful act or omission occurred, despite any non-discovery or any tolling, the medical malpractice action or potential action ceases to exist by abrogation of law under the statute of repose.

(Citations and punctuation omitted.) *Simmons v. Sonyika*, 279 Ga. at 380.

Georgia's medical malpractice statute of repose specifically addresses the application of the statute to children. If the child was age five or older on the date of the malpractice, the statute applies without modification and no action may be filed by or on behalf of the minor after five years from the date on which the wrongful act or omission occurred. OCGA § 9-3-73 (c) (2) (B). If the negligent or

---

[9] See OCGA § 9-3-73 (a) (the disabilities and exceptions prescribed in OCGA §§ 9-3-90-9-3-99 shall be applicable to actions for medical malpractice), (b) (infancy and incompetency); § 9-3-96 (fraud).

wrongful act or omission occurred before the child's fifth birthday, no action for medical malpractice may be brought after the child's tenth birthday. OCGA § 9-3-73 (c) (2) (A). It follows from these authorities that Canas's argument that the statutory repose period was tolled until he reached the age of majority or until he discovered the misdiagnosis lacks merit.

*The medical malpractice statute of repose is constitutional.* As noted above, Canas directed his appeal to the Supreme Court of Georgia on the basis of the trial court's rulings on his constitutional challenges to the medical malpractice statute of repose and statute of limitation. The Supreme Court transferred the appeal to this Court, noting that it "has previously upheld [OCGA §§ 9-3-71 and 9-3-73] against the same challenges as they relate to minors. See *Crowe v. Humana Hospital*, 263 Ga. 833 (439 SE2d 654) (1994); *Smith v. Cobb County-Kennestone Hospital*, 262 Ga. 566 (423 SE2d 235) (1992). Accordingly, the constitutional rulings do not invoke [the Supreme] Court's jurisdiction."[10] Thus, this appeal was transferred because our Supreme Court deemed the constitutional issues presented merely to involve the application of established constitutional law to the facts. Because OCGA §§ 9-3-71 and 9-3-73 have previously been held constitutional against similar attacks, all of Canas's arguments challenging the constitutionality of the statutes are without merit. *Braden v. Bell*, 222 Ga. App. 144, 146 (1) (473 SE2d 523) (1996).

*A medical malpractice defendant may be equitably estopped from asserting the defense of the statute of repose if the defendant's fraud prevented the plaintiff from learning the nature and cause of the injury and bringing suit.* "[B]y definition, a statute of ultimate repose cannot be tolled," even by fraud under OCGA § 9-3-96,[11] "to permit actions to be brought for injuries which did not occur until after the statutory period had expired." (Citations and punctuation omitted.) *Esener v. Kinsey*, 240 Ga. App. at 22. But a medical malpractice defendant may be equitably estopped from asserting the defense of the statute of repose if the plaintiff shows fraud by offering evidence the defendant actively concealed the negligence or, given the duty arising from the doctor-patient relationship to disclose the cause of

---

[10] See also *Craven v. Lowndes County Hosp. Auth.*, 263 Ga. at 659-660 (1), (2) (the classification created by the medical malpractice statute of repose, victims of medical malpractice who discover their injuries within five years after the negligent act or omission *versus* those who discover their injuries more than five years later, bears a rational relationship to a legitimate end of government, that is, eliminating stale claims); OCGA § 9-3-73 (f) (state objectives of the Code section were "providing quality health care, assuring the availability of physicians, preventing the curtailment of medical services, stabilizing insurance and medical costs, preventing stale medical malpractice claims, and providing for the public safety, health, and welfare as a whole").

[11] See Division 1 (b), infra.

any injury, knowingly failed to reveal the negligence to the plaintiff. *Craven v. Lowndes County Hosp. Auth.*, 263 Ga. at 660 (3); *Esener v. Kinsey*, 240 Ga. App. at 22-23; *Bynum v. Gregory*, 215 Ga. App. 431, 434 (2) (450 SE2d 840) (1994).

> [T]he statute of ultimate repose should not be applied to relieve a defendant of liability for injuries which occurred during the period of liability, but which were concealed from the patient by the defendant's own fraud. The statute of ultimate repose should not provide an incentive for a doctor or other medical professional to conceal his or her negligence with the assurance that after [five] years such fraudulent conduct will insulate him or her from liability. The sun never sets on fraud. . . .

> The statute of repose is not tolled by fraud, but fraud, instead, gives rise to the doctrine of equitable estoppel, which prevents the defendant from asserting the defense of the statute of repose, because his or her own wrongful conduct gave rise to the defense and prevented the plaintiff from exercising reasonable diligence to learn the nature and cause of the injury attributable to the defendant and from bringing suit.

(Citations and punctuation omitted.) *Esener v. Kinsey*, 240 Ga. App. at 22-23. Thus, "if the evidence of defendant's fraud or other conduct on which the plaintiff reasonably relied in forbearing the bringing of a lawsuit is found by the jury to exist, then the defendant, under the doctrine of equitable estoppel, is estopped from raising the defense of the statute of ultimate repose." Id. Of course, without more, "[a] mere misdiagnosis is insufficient to raise an issue of fraud." (Citation and punctuation omitted.) *Craven v. Lowndes County Hosp. Auth.*, 263 Ga. at 660 (3). See also *Hutcherson v. Obstetric &c. Assoc. of Columbus*, 247 Ga. App. 685, 688 (2) (543 SE2d 805) (2000) (accord).

In the case at bar, there is absolutely nothing supporting an inference that either Al-Jabi or Kaminer ever knew or even suspected that Canas might have AIDS before he received that diagnosis from another doctor. Thus, Canas failed to present any evidence these doctors knowingly concealed or knowingly failed to reveal their own alleged negligence. Accordingly, Canas failed to show that Al-Jabi and Kaminer should be equitably estopped from asserting the de-

fense of statute of repose. *Craven v. Lowndes County Hosp. Auth.*, 263 Ga. at 660 (3).[12]

*The determination of the date on which a medically negligent or wrongful act or omission occurs is not subject to the continuing tort or continuous treatment doctrines.* In misdiagnosis cases, the negligent act or omission generally occurs when the doctor fails to make the correct diagnosis (or to recognize the need for further diagnostic tests) when presented with a patient with an injury,[13] a patient with symptoms of a medical condition,[14] or a patient with no symptoms but with a diagnostic test indicative of a medical condition.[15]

In many cases, a patient, unaware that his or her doctor failed to make the correct diagnosis, continues in treatment with the doctor for a significant period of time. In arguing that the date of the negligent or wrongful act or omission in a misdiagnosis case can be no earlier than the date the patient receives the correct diagnosis, Canas seeks to apply the "continuing tort" doctrine to misdiagnosis cases. Under Georgia law, the continuing tort doctrine fixes the date of injury, which marks the beginning of the statutory limitation period,[16] in certain cases where a "negligent or tortious act is of a continuing nature and produces injury in varying degrees over a period of time" such as a breach of a duty to warn of the existence of a hazard capable of producing injury. *Everhart v. Rich's*, 229 Ga. 798, 802 (2) (194 SE2d 425) (1972) (sale of harmful goods). See also *Parker v. Vaughan*, 124 Ga. App. 300, 302-303 (183 SE2d 605) (1971) (foreign object left in patient's body). In such a case, "a cause of action accrues when exposure to the hazard first produces ascertainable injury" but the statutory limitation period does not begin to run "until such time as the continued tortious act producing injury is eliminated, e.g., by an appropriate warning in respect to the hazard," *Everhart v. Rich's*, 229 Ga. at 802 (2), or until the plaintiff "has knowledge, or through the exercise of ordinary care could have learned, of the existence of

---

[12] Cf. *Hutcherson v. Obstetric &c. Assoc. of Columbus*, 247 Ga. App. at 688 (2); *Esener v. Kinsey*, 240 Ga. App. at 22; *Bynum v. Gregory*, 215 Ga. App. at 434 (2); *Hill v. Fordham*, 186 Ga. App. 354, 357 (2) (367 SE2d 128) (1988).

[13] See, e.g., *Young v. Williams*, 274 Ga. 845 (560 SE2d 690) (2002) (dislocated bones in foot); *Walker v. Melton*, 227 Ga. App. 149 (489 SE2d 63) (1997) (broken vertebra).

[14] See, e.g., *Hutcherson v. Obstetric &c. Assoc. of Columbus*, 247 Ga. App. at 688 (2) (shortness of breath, edema, and irregular heartbeat); *Oliver v. Sutton*, 246 Ga. App. 436, 437 (540 SE2d 645) (2000) (ankle pain); *Ford v. Dove*, 218 Ga. App. 828, 830 (2) (463 SE2d 351) (1995) (blood in urine); *Zechmann v. Thigpen*, 210 Ga. App. 726 (437 SE2d 475) (1993) (eye dragging).

[15] See, e.g., *Craven v. Lowndes County Hosp. Auth.*, 263 Ga. at 660 (2) (biopsy of mole); *Ward v. Bergen*, 277 Ga. App. 256 (626 SE2d 224) (2006) (mammogram); *Whitaker v. Zirkle*, 188 Ga. App. 706 (374 SE2d 106) (1988) (biopsy of mole).

[16] See Division 1 (b), infra.

the continuing tort." *Parker v. Vaughan*, 124 Ga. App. at 302. The continuing tort doctrine has *not* been applied, however, to fix the date of the tortious act, which marks the beginning of a statutory period of ultimate repose and abrogation.[17] To the contrary, we have rejected the argument that, after an initial misdiagnosis, a doctor's "continued failure to recognize the [patient's] problem constitute[s] a continuing tort." *Frankel v. Clark*, 213 Ga. App. 222, 223 (444 SE2d 147) (1994). As we have observed, in actions for medical malpractice the continuing tort doctrine "would nullify the intent of the General Assembly that, after five years, no medical malpractice action could be brought, even when a disability attaches to toll the running of the statute because the statute of repose abolishes any action five years after the negligent or wrongful act or omission." (Citations omitted.) *Charter Peachford Behavioral Health System v. Kohout*, 233 Ga. App. 452, 456 (b) (504 SE2d 514) (1998) (physical precedent only).

Under the continuous treatment doctrine, the negligent act is deemed to "continue[ ] as long as the patient remains under the physician's care." *Young v. Williams*, 274 Ga. at 846. Thus, in contrast to the continuing tort doctrine, the continuous treatment doctrine pertains to the date relevant to the statute of repose, that is, the date of the negligent or wrongful act or omission.[18] Still, if the General Assembly intended for the medical malpractice statute of repose to abrogate only those medical malpractice actions filed more than five years after the date on which the negligent or wrongful act or omission occurred *and* more than five years after the date on which treatment by the health care provider ended, it could have so provided. Applying the continuous treatment doctrine in actions for medical malpractice would also appear to nullify the intent of the General Assembly to abolish any medical malpractice action five years after the negligent conduct. For these reasons, Canas's argument that the statutory period of repose began running only when Al-Jabi's and Kaminer's treatment of Canas ended lacks merit.

*If a health care provider commits separate negligent acts or omissions against the same patient, each negligent act or omission may be subject to a separate statutory repose period.* Although, as discussed above, the determination of the date on which a medically

---

[17] See *Waters v. Rosenbloom*, 268 Ga. 482, 483 (2) (490 SE2d 73) (1997) (not reaching appellants' argument that Court should apply the continuing tort doctrine to the medical malpractice statute of repose).

[18] See *Young v. Williams*, 274 Ga. at 846 (suggesting in dicta that the continuous treatment doctrine is more appropriately incorporated into a limiting statute that commences upon the occurrence of the negligent act); *Eyzaguirre v. Baker*, 260 Ga. App. 53, 55 (1) (579 SE2d 47) (2003) (pointing out in dicta that the medical malpractice statute of repose is such a limiting statute that commences upon the occurrence of the negligent act).

negligent or wrongful act or omission occurs is not subject to the continuing tort or continuous treatment doctrines, that is not the same as saying that for every malpractice claim based on a failure to diagnose a patient the trigger date for the statute of repose must be the date on which a doctor first misdiagnoses the patient. As we have held, persisting in a misdiagnosis does not by itself constitute a new negligent act or omission. *Frankel v. Clark*, 213 Ga. App. at 223. On the other hand, where a patient continues to be treated by the doctor and presents the doctor with a significant change in manifestations of his condition — additional symptoms or significantly increased symptoms — such that the standard of care would require the doctor to reevaluate the first diagnosis, it can be a new negligent act or omission to fail to reconsider the original diagnosis and take appropriate action. See *Zechmann v. Thigpen*, 210 Ga. App. at 730 (4) (discussing sequential separate misdiagnoses). To hold otherwise would be to declare that as a matter of law a doctor can only misdiagnose a patient once, regardless of the length of the treatment or the course of the patient's illness. This would be absurd. It follows that if a plaintiff files suit more than five years after an initial misdiagnosis, but within five years after a later misdiagnosis which rises to the level of a new and separate negligent act or omission, only the claim for injuries arising from the first diagnosis will be abrogated by the statute of repose.

As discussed in the recitation of facts, Canas's own experts testified that Canas presented to Al-Jabi and Kaminer with hallmark symptoms of pediatric AIDS at least by 1994 and suffered harm from continuing without the proper treatment until he was diagnosed in 2001. Any medical malpractice claim arising from Al-Jabi's and Kaminer's failure to recognize in 1994 that Canas's condition might not be entirely due to his heart defect, and to take the steps which would have led to an AIDS diagnosis, are abrogated by the statute of repose, because Canas filed his complaint more than five years after the allegedly negligent acts and omissions.

There is evidence, on the other hand, that after the initial misdiagnoses Canas presented Al-Jabi and Kaminer with significant changes in the manifestations of his condition. For example, beginning in early 2000 Canas experienced shortness of breath, wheezing, tightness in his chest, repeated bronchitis and pneumonia, and intolerance for exercise. In addition, there is evidence that in early 2000 Canas's height and weight were so low compared to the norm for boys his age that Kaminer was startled. A jury could infer that Al-Jabi and Kaminer should have reevaluated their diagnoses based on such new and different manifestations of the disease. To the extent Canas

filed his complaint within five years of any such new negligent acts and omissions, his malpractice claim is not abrogated by the statute of repose.

(b) Statute of Limitation

Under OCGA § 9-3-71 (a), "an action for medical malpractice shall be brought within two years after the date on which an injury or death arising from a negligent or wrongful act or omission occurred." This statute "is intended to create a two-year statute of limitations." OCGA § 9-3-71 (c). "A statute of limitation has as its purpose the limiting of the time period in which an action may be brought, thereby providing a date certain after which potential defendants can no longer be held liable for claims brought on such actions. It is a procedural rule limiting the time in which a party may bring an action for a right which has already accrued." (Citations and punctuation omitted.) *Young v. Williams*, 274 Ga. at 848. See also *Craven v. Lowndes County Hosp. Auth.*, 263 Ga. at 660 (2).

As in the medical malpractice statute of repose, the Code specifically addresses the application of the statute to children and provides that the two-year limitation period applies to "all minors who have attained the age of five years." OCGA § 9-3-73 (b). "A minor who has not attained the age of five years shall have two years from the date of such minor's fifth birthday within which to bring a medical malpractice action if the cause of action arose before such minor attained the age of five years." Id. Thus, if the injury or death arising from a negligent or wrongful act or omission occurs, and therefore the cause of action accrues, before the child's fifth birthday, the child shall have two years from his fifth birthday to bring the action. *Crowe v. Humana, Inc.*, 263 Ga. at 833-834 (1).

Canas contends the appellees are not entitled to judgment as a matter of law on the basis of Georgia's two-year medical malpractice statute of limitation as to any aspect of his malpractice claim. As with his arguments concerning the statute of repose, Canas contends the medical malpractice statutory limitation period is tolled until the injured person reaches the age of majority. Again, Canas contends that if the limitation period is not tolled then the statute is unconstitutional. In addition, Canas contends that, as a matter of law, his cause of action did not accrue until 2000 when Al-Jabi's and Kaminer's treatment ended and when he discovered their misdiagnoses. Canas also contends the limitation period was tolled by fraudulent concealment of the misdiagnoses.

Kaminer and the Board contend, on the other hand, that Canas's alleged injury occurred more than two years before the date this action was filed and, therefore, that the trial court erred in granting only partial summary judgment on Canas's malpractice claim. They contend that in a misdiagnosis case, such as this, the injury occurs

immediately upon misdiagnosis. Accordingly, they contend, an injury from the alleged misdiagnosis occurred by the end of 1994, and Canas's action, filed seven years later, is precluded by the statute of limitation.[19]

*The medical malpractice statutory limitation period is not tolled until an injured minor reaches the age of majority.* Minors are subject to the specific period of limitation provided for medical malpractice actions in OCGA §§ 9-3-71 (a) and 9-3-73 (b), rather than the more general tolling provision for minors set out in OCGA § 9-3-90 (a). *Crowe v. Humana, Inc.*, 263 Ga. at 833-834 (1); *Smith v. Cobb County-Kennestone Hosp. Auth.*, 262 Ga. at 568-571 (1), (2). Canas's argument that the statutory limitation period was tolled until he reached the age of majority lacks merit.

*The medical malpractice statute of limitation is constitutional.* The Supreme Court of Georgia has held that the classification of minors in OCGA § 9-3-73 for purposes of the limitation of medical malpractice actions satisfies the constitutional requirements of equal protection. *Crowe v. Humana, Inc.*, 263 Ga. at 834 (2); *Smith v. Cobb County-Kennestone Hosp. Auth.*, 262 Ga. at 570-571 (1) (b). Again, Canas's argument in this regard presents no basis for us to reverse the trial court's decision. *Braden v. Bell*, 222 Ga. App. at 146 (1). See Division 1 (a), supra.

*In medical malpractice cases, the right of action accrues on the date on which the injury arising from a negligent or wrongful act or omission occurs.* Generally, the limitation period for a tort begins to run from the date "the right of action accrues." OCGA § 9-3-33. In theory, a tort right of action may be defined as accruing at one of four points: "(I) when the defendant breaches his duty; (II) when the plaintiff is first injured; (III) when the plaintiff becomes aware of his injury; or (IV) when the plaintiff discovers the causal relationship between his injury and the defendant's breach of duty." (Citation and punctuation omitted.) *Jones v. Lamon*, 206 Ga. App. 842, 844 (1) (426 SE2d 657) (1992). For medical malpractice actions, the General Assembly chose Point II, the date of first injury. OCGA § 9-3-71 (a). See *Jones v. Lamon*, 206 Ga. App. at 844 (1). "[T]he focus of OCGA § 9-3-71 (a) is not the date of the negligent act [or omission] but the consequence of the defendant's acts on the plaintiff." (Citation and punctuation omitted.) *Oliver v. Sutton*, 246 Ga. App. at 437.

*The medical malpractice statutory limitation period is not tolled until the injured person discovers the negligent or wrongful act or omission. The determination of the date on which the injury arising*

---

[19] Again, the Board joins in Kaminer's arguments to the extent Canas seeks to hold it derivatively liable for Kaminer's medical malpractice.

*from a misdiagnosis occurs is not subject to the continuing tort or continuous treatment doctrines.* In a misdiagnosis case, the negligent act or omission typically does not cause the medical condition. The patient usually first presents to the doctor with the medical condition (infection, malignancy, injury, etc.). In the interval between the negligent misdiagnosis and the correct diagnosis, the patient does not receive the medical therapies needed for his actual condition and is harmed by the delay in needed treatment, by the receipt of unneeded medical therapies for a condition the patient does not have, or both.[20]

This Court has consistently held that, in most misdiagnosis cases, "the injury begins immediately upon the misdiagnosis due to the pain, suffering, or economic loss sustained by the patient from the time of the misdiagnosis until the medical problem is properly diagnosed and treated." (Citation and punctuation omitted.) *Williams v. Young*, 258 Ga. App. 821, 823 (575 SE2d 648) (2002). See also *Kane v. Shoup*, 260 Ga. App. 723 (580 SE2d 555) (2003); *Oliver v. Sutton*, 246 Ga. App. at 437.[21]

Because of this, the statutory limitation period is not tolled until the person injured by a negligent misdiagnosis discovers the cause of the injury. Indeed, the Supreme Court of Georgia has held that "initiating the period of limitation in a medical malpractice action when the alleged negligence is first discovered would be contrary to the plain language of § 9-3-71 and § 9-3-73." *Crowe v. Humana, Inc.*, 263 Ga. at 833-834 (1). The fact that the plaintiff may not know the medical cause of his or her suffering on the date of the misdiagnosis does not affect the applicability of the statute of limitation, even where the plaintiff was effectively precluded from bringing suit in time because he or she could not reasonably have known that his or her legal rights had been invaded before the limitation period expired. *Williams v. Young*, 258 Ga. App. at 823; *Luem v. Johnson*, 258 Ga. App. 530, 535 (2) (574 SE2d 835) (2002) (physical precedent only); *Charter Peachford Behavioral Health System v. Kohout*, 233 Ga. App.

---

[20] See, e.g., *Kane v. Shoup*, 260 Ga. App. 723 (580 SE2d 555) (2003) (surgery and additional bracing needed because of delay in correcting lower jaw condition); *Hughley v. Frazier*, 254 Ga. App. 544 (562 SE2d 821) (2002) (physical precedent only) (unneeded surgery which left plaintiff incontinent); *Hutcherson v. Obstetric &c. Assoc. of Columbus*, 247 Ga. App. at 688 (2) (death from delay in diagnosing heart attack); *Oliver v. Sutton*, 246 Ga. App. at 437 (pain from untreated osteoarthritis); *Charter Peachford Behavioral Health System v. Kohout*, 233 Ga. App. at 456 (b) (physical precedent only) (unneeded psychiatric hospitalizations and therapy); *Ford v. Dove*, 218 Ga. App. at 830 (3) (death from delay in diagnosing brain tumor); *Frankel v. Clark*, 213 Ga. App. at 223 (pain from untreated oral cyst under new dental bridge).

[21] Our oft-repeated shorthand statement that "the misdiagnosis itself is the injury" does not mean to equate the negligent act or omission (the misdiagnosis) with the consequences of that act (the injury) but rather signifies that "the [date of the] misdiagnosis itself is [the date of the beginning of] the injury," which is deemed the date "the injury occurred" for purposes of the statute of limitation. See, e.g., *Williams v. Young*, 258 Ga. App. at 823.

at 456 (b) (physical precedent only); *Ford v. Dove*, 218 Ga. App. at 830 (3); *Frankel v. Clark*, 213 Ga. App. at 223; *Jones v. Lamon*, 206 Ga. App. at 844 (1). It follows that the continuing tort doctrine does not apply in medical malpractice misdiagnosis cases.[22] *Hughley v. Frazier*, 254 Ga. App. at 546 (1) (physical precedent only).

Furthermore, the Supreme Court of Georgia has specifically rejected application of the continuous treatment or course of care theory in medical malpractice actions because

> [p]rescribing periods of limitation is a legislative, not a judicial, function. The General Assembly has determined that medical malpractice actions must be filed within two years of the occurrence of injury or death arising from a negligent or wrongful act or omission. OCGA § 9-3-71 (a). The legislatively-prescribed statute of limitation does not provide for the commencement of the period of limitation upon the termination of the health-care provider's treatment of the patient, and the judicial branch is not empowered to engraft such a provision on to what the legislature has enacted.

(Citation and punctuation omitted.) *Young v. Williams*, 274 Ga. at 847-848.[23] For these reasons, Canas's argument that the statutory limitation period began running only when Canas discovered his injury, or when Al-Jabi's and Kaminer's treatment of him ended, lacks merit.

*The medical malpractice statutory limitation period may be tolled by the defendant's fraud.* OCGA § 9-3-96 provides for tolling of the limitation period by a defendant's fraud, as follows: "If the defendant or those under whom he claims are guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud." See OCGA § 9-3-73 (a) (the disabilities and exceptions prescribed in OCGA Title 9, Chapter 3, Article 5,

---

[22] As we discussed in Division 1 (a), supra, application of the continuing tort doctrine causes the statutory limitation period to begin to run when the tortious exposure to a hazard was eliminated by an appropriate warning or when the plaintiff otherwise discovered or should have discovered the existence of the continuing tort.

[23] We note that on remand of *Young v. Williams*, "[i]n light of the inequities inherent in cases ... in which a patient remains under the care of one physician and the statute of limitation expires on [the patient's] claim," this Court "encourage[d] the General Assembly ... to look into and remedy this situation by enacting a statute allowing the incorporation of the continuous treatment doctrine into the existing statute of limitation provided for in OCGA § 9-3-71. A legislative enactment to this effect would create a more just statutory scheme for this type of medical malpractice case." *Williams v. Young*, 258 Ga. App. at 824. The General Assembly has not done so.

which includes OCGA § 9-3-96, shall be applicable to actions for medical malpractice). Thus,

> [a]ctual fraud, through nondisclosure of a known injury or through acts to conceal the injury, which deters or debars the bringing of the action, tolls the running of the statute until discovery of the fraud. Fraud sufficient to toll the statute of limitation requires: (1) actual fraud involving moral turpitude on the part of the defendant; (2) the fraud must conceal the cause of action from the plaintiff, thereby debarring or deterring the knowing of the cause of action; and (3) the plaintiff must have exercised reasonable diligence to discover the cause of action, notwithstanding the failure to discover within the statute of limitation.

(Citations and punctuation omitted.) *Kane v. Shoup*, 260 Ga. App. at 726 (2).

Furthermore, "[w]here a confidential doctor-patient relationship exists, such fraud may be constructive, and silence when there is a duty to speak can constitute fraud." (Citations and punctuation omitted.) *Kane v. Shoup*, 260 Ga. App. at 726 (2). See also *Charter Peachford Behavioral Health System v. Kohout*, 233 Ga. App. at 457-458 (c) (physical precedent only) (in the case of a confidential doctor-patient relationship, "concealment per se or intentional silence amounts to actual fraud that tolls the statute") (citations omitted). This rule is based upon the premise that

> [a] patient has the right to believe what he is told by his medical doctors about his condition. The statute of limitation would not begin to run if the defendant physician had assured him that the injuries which had manifested themselves were only slight or only temporary and assured him that he would eventually be all right, thereby inducing plaintiff to refrain from making any further inquiry into his condition.

(Citation and punctuation omitted.) *Hill v. Fordham*, 186 Ga. App. at 355 (1).

> Thus, while a physician has a fiduciary duty to inform his patient of any injury or negligent mistreatment, to establish fraud a plaintiff must present evidence that the physician knew that the plaintiff was injured in the ways plaintiff contends; that the physician knew that his violations of the

standard of care caused such injuries; and that he intentionally concealed such fact.

(Citations and punctuation omitted.) *Kane v. Shoup*, 260 Ga. App. at 726 (2). Again, "[a] mere misdiagnosis is insufficient to raise an issue of fraud. Thus, if the defendant never learns or has no reason to believe that there has been a misdiagnosis, then there can be no concealment, because there must be the actual intent to mislead or to conceal, involving moral turpitude." (Citations and punctuation omitted.) *Charter Peachford Behavioral Health System v. Kohout*, 233 Ga. App. at 459 (c) (physical precedent only).

> To toll the running of the statute of limitation by fraud or concealment, plaintiff must present evidence to show such concealment or fraud by each defendant against whom such tolling is sought to apply. Even where the plaintiff can show actual fraud exists, if plaintiff knew all of the facts necessary to show malpractice prior to the running of the statute, then such knowledge will prevent the statute from being tolled.

(Citations omitted.) Id. at 457 (c) (physical precedent only). In this case, Canas has identified no evidence that either Al-Jabi or Kaminer knew that Canas was HIV positive and suffered from AIDS, that Al-Jabi or Kaminer knew that their violations of the standard of care caused Canas not to be correctly diagnosed, and that they intentionally concealed their negligence. As a result, the statutory limitation period was not tolled as a matter of law. *Craven v. Lowndes County Hosp. Auth.*, 263 Ga. at 660 (3); *Kane v. Shoup*, 260 Ga. App. at 726 (2); *Hutcherson v. Obstetric &c. Assoc. of Columbus*, 247 Ga. App. at 688 (2); *Charter Peachford Behavioral Health System v. Kohout*, 233 Ga. App. at 459 (c) (physical precedent only); *Stone v. Radiology Svcs.*, 206 Ga. App. 851, 853 (2) (426 SE2d 663) (1992) (physical precedent only).[24]

*The determination of the date on which an injury arising from a medically negligent or wrongful act or omission occurs may be subject to the new injury rule.* Although, in most misdiagnosis cases, the actionable injury begins immediately upon the misdiagnosis, as discussed above, in some cases a patient may also suffer a new injury as a relatively benign or treatable precursor condition, which is left untreated because of the misdiagnosis, progresses to a more dangerous condition.[25]

---

[24] Cf. *Bynum v. Gregory*, 215 Ga. App. at 434 (1); *Hill v. Fordham*, 186 Ga. App. at 357 (2).
[25] See, e.g., *Ward v. Bergen*, 277 Ga. App. 256 (localized precancerous growths progressed

> Georgia's appellate courts . . . have carved out a "limited exception" in cases where a misdiagnosis and failure to provide proper treatment results in the development of a new and different injury than that which existed at the time of the misdiagnosis. In those cases, the focus of OCGA § 9-3-71 (a) is not on the date of the negligent act but the consequence of the defendant's acts on the plaintiff. The result is that when an injury occurs subsequent to the date of the medical treatment, the statute of limitation commences from the date the injury is discovered.

(Citations and punctuation omitted.) *Ward v. Bergen,* 277 Ga. App. at 258-259. This limited exception has the effect of changing the date the injury occurs in certain cases of misdiagnosis, such that a claim will survive a statute of limitation challenge even though the plaintiff files the complaint more than two years after the misdiagnosis.[26] See *Jones v. Lamon,* 206 Ga. App. at 846 (1) (criticizing *Whitaker v. Zirkle,* 188 Ga. App. 706, in which exception was created).

This limited exception applies only "in the most extreme circumstances" and "is confined to those cases in which the plaintiff remains asymptomatic for a period of time following the misdiagnosis." *Burt v. James,* 276 Ga. App. 370, 374 (623 SE2d 223) (2005).[27] But the exception does not apply where the plaintiff's condition remains "fairly constant," even though the patient's symptoms "may have been more painful, more extensive, and more debilitating [later;] . . . that [is] a matter of degree." *Burt v. James,* 276 Ga. App. at 373 (pain immediately after back surgery).[28]

---

to metastatic breast cancer); *Walker v. Melton,* 227 Ga. App. 149 (a minor vertebral fracture progressed to worsened vertebral compression, failure of a spinal ligament, and destabilization of the spine); *Zechmann v. Thigpen,* 210 Ga. App. 726 (a minor eye condition progressed to glaucoma and destruction of the eye); *Whitaker v. Zirkle,* 188 Ga. App. 706 (a malignant mole progressed to metastatic melanoma).

[26] We note that the exception does not "toll" the statutory repose period. A claim filed more than five years after the negligent act or omission of the misdiagnosis may fall to a statute of repose challenge, regardless of the new injury exception. *Zechmann v. Thigpen,* 210 Ga. App. at 730 (4).

[27] See also *Ward v. Bergen,* 277 Ga. App. 256 (four years after positive mammogram before another mammogram revealed the metastatic cancer); *Walker v. Melton,* 227 Ga. App. 149 (18 months without back pain); *Zechmann v. Thigpen,* 210 Ga. App. 729 (3) (four years before eye pain appeared); *Whitaker v. Zirkle,* 188 Ga. App. 706 (seven years before cancer symptoms appeared).

[28] See also *Brahn v. Young,* 265 Ga. App. 705, 708 (2) (595 SE2d 553) (2004) (plaintiff experienced postoperative complications immediately after surgery); *Williams v. Young,* 258 Ga. App. at 824 (plaintiff experienced symptoms continuously throughout doctor's treatment); *Charter Peachford Behavioral Health System v. Kohout,* 233 Ga. App. at 461 (e) (physical precedent only) (same); *Stone v. Radiology Svcs.,* 206 Ga. App. at 853 (2) (physical precedent only) (plaintiff was already suffering from effects of a brain tumor when he was misdiagnosed).

Canas's case is premised on these alleged facts: he had AIDS at the beginning of his treatment with Al-Jabi and Kaminer; he had a medical history indicating the possibility of HIV infection; and he had symptoms of AIDS such that Al-Jabi and Kaminer should have recognized a need for further investigation. Canas did not have a more benign precursor condition; nor did he have an asymptomatic period. Instead, his untreated AIDS continuously caused his growth to be stunted, his immune system to be compromised, and his life expectancy to be diminished. Therefore, the limited "new injury" exception does not apply in this case. *Williams v. Young*, 258 Ga. App. at 824.

*If a health care provider commits separate negligent acts or omissions against the same patient, each negligent act or omission may be subject to a separate statutory limitation period.* As with the statute of repose analysis, see Division 1 (a), supra, a patient who continues in treatment after one misdiagnosis may experience separate later acts of negligence where the doctor persists in the misdiagnosis after the patient presents the doctor with a significant change in manifestations of his condition. See *Oliver v. Sutton*, 246 Ga. App. at 438 (doctor's failure to communicate a corrected diagnosis constituted a separate act of negligence from the original misdiagnosis). Because an effect logically cannot occur before its cause, the injury from the new negligent act or omission cannot be deemed to have occurred any earlier than the date of the new misdiagnosis. It follows that, if a plaintiff files suit more than two years after an initial misdiagnosis, but within two years after a later misdiagnosis which rises to the level of a new negligent act or omission, only the claim for injuries arising from the first diagnosis will be barred by the statute of limitation.

As discussed above, Canas claims that Al-Jabi and Kaminer should have recognized by 1994 that his condition might not be entirely due to his heart defect and should have taken the steps which would have led to an AIDS diagnosis. In addition to being abrogated by the statute of repose, see Division 1 (a), supra, Canas's claims based on his failure to be treated between 1994 and his diagnosis in 2001 are also barred by the statute of limitation because he filed his complaint more than two years after the injury, which began (and therefore occurred for purposes of the statute) on the day of the initial misdiagnosis.

But, again, there is evidence that after the initial misdiagnoses Canas presented Al-Jabi and Kaminer with significant changes in the manifestations of his condition such that a jury could infer that Canas was injured as a result of new and separate negligent acts or omissions. To the extent Canas filed his complaint within two years

after such injury occurred, his medical malpractice claim is not barred by the statute of limitation. See Division 1 (a), supra.

2. Kaminer, the Board, and MCGHI contend they are entitled to judgment as a matter of law on Canas's failure to warn claim.[29]

(a) With regard to Canas's claim that the Board and its successor MCGHI breached a duty to notify him that he was at high risk for HIV infection because he was transfused with untested blood, the Board and MCGHI contend the claim is one for medical malpractice, and not one for ordinary negligence. As a result, these appellees contend, they are entitled to summary judgment under the medical malpractice statute of repose and statute of limitation. See Division 1, supra. We disagree.

Under OCGA § 9-3-70, the term "action for medical malpractice" means

> any claim for damages resulting from the death of or injury to any person arising out of:
>
> (1) Health, medical, dental, or surgical service, diagnosis, prescription, treatment, or care rendered by a person authorized by law to perform such service or by any person acting under the supervision and control of the lawfully authorized person; or
>
> (2) Care or service rendered by any public or private hospital, nursing home, clinic, hospital authority, facility, or institution, or by any officer, agent, or employee thereof acting within the scope of his employment.

The statutory definition plainly contemplates the viability of a medical malpractice claim against a hospital directly *as an institution* for negligent medical care or medical services, as distinct from a derivative claim based on respondeat superior liability for the malpractice of a hospital's agents and employees. See *Bradway v. American Nat. Red Cross*, 263 Ga. 19, 21 (426 SE2d 849) (1993) (malpractice claim against not-for-profit blood bank); *Frieson v. South Fulton Med. Center*, 255 Ga. App. 217, 218 (564 SE2d 821) (2002) (malpractice claim against a hospital); *Shirley v. Hosp. Auth. of Valdosta/Lowndes*

---

[29] The trial court's order did not explicitly address the parties' arguments regarding whether all of Canas's claims are properly deemed claims for medical malpractice, subject to OCGA §§ 9-3-71 and 9-3-73. Thus, it is not clear from the order whether the trial court considered all of Canas's claims to be claims for medical malpractice, or whether the trial court simply failed to dispose of the appellees' motions with regard to any ordinary negligence or fraud claims asserted. The record clearly shows, however, that the parties' contentions were before the trial court when ruling on the motions for summary judgment. Because our review of the trial court's order granting partial summary judgment is de novo, *Latson v. Boaz*, 278 Ga. 113 (598 SE2d 485) (2004), we address the issue on appeal.

*County*, 263 Ga. App. 408, 409 (1) (587 SE2d 873) (2003) (same); *Moore v. Louis Smith Mem. Hosp.*, 216 Ga. App. 299 (454 SE2d 190) (1995) (malpractice action against a nursing home).[30]

Although the term "medical malpractice" embraces care or service rendered by a hospital, however, "[s]imply because an alleged injury occurs in a hospital setting, a suit to recover for that injury is not necessarily a 'medical malpractice' action. Likewise, not every suit which calls into question the conduct of one who happens to be a medical professional is a 'medical malpractice' action." (Citations and punctuation omitted.) *Jones v. Bates*, 261 Ga. 240, 242 (2) (403 SE2d 804) (1991). See also *Moore v. Louis Smith Mem. Hosp.*, 216 Ga. App. at 299 (rejecting the argument that any cause of action arising out of care provided by a health care facility is automatically one for medical malpractice).

> Whether an action alleges professional negligence or simple negligence depends on whether the professional's alleged negligence required the exercise of professional judgment and skill. . . . A professional negligence [or professional malpractice] claim calls into question the conduct of the professional in his area of expertise. . . . [I]f a claim of negligence goes to the propriety of a professional decision[,] rather than to the efficacy of conduct in the carrying out of a decision previously made, the claim sounds in professional malpractice.

(Citation and punctuation omitted.) *MCG Health, Inc. v. Casey*, 269 Ga. App. 125, 128 (603 SE2d 438) (2004). "Medical malpractice exists only where the act or omission by the professional requires the exercise of expert medical judgment." (Citations omitted.) *Jones v. Bates*, 261 Ga. at 242 (2). Where the care or service that allegedly resulted in the plaintiff's injury is "by [its] very nature" medical care or a medical service involving medical knowledge and judgment, the claim is one for malpractice. *Bradway v. American Nat. Red Cross*, 263 Ga. at 21. In other words, to decide whether a claim is one for medical malpractice, the trial court must determine whether the case

---

[30] But see *Lamb v. Candler Gen. Hosp.*, 262 Ga. 70, 72 (2) (413 SE2d 720) (1992) (a hospital is not "a professional," and, therefore, a claim against a hospital is not one involving medical malpractice, subject to OCGA § 9-11-9.1); *Upson County Hosp. v. Head*, 246 Ga. App. 386, 389 (1) (540 SE2d 626) (2000) (a hospital is not "a professional," and, therefore, a claim against a hospital is for medical malpractice, subject to OCGA § 9-11-9.1, only when liability is based upon respondeat superior and is grounded upon acts or omissions requiring the exercise of professional skill and judgment by agents or employees who are legally classified as professionals).

involves a "medical question." (Footnote omitted.) *Shirley v. Hosp. Auth. of Valdosta/Lowndes County*, 263 Ga. App. at 409 (1).

> "Medical questions" have been defined as those concerning highly specialized expert knowledge with respect to which a layman can have no knowledge at all, and the court and jury must be dependent on expert evidence. Examples of medical questions include cases where the plaintiff alleges the use of inappropriate medication, wrongful administration of medication, or failure to properly assess the degree of support required by a patient.

(Punctuation and footnotes omitted.) Id. at 409 (1).

On the other hand, "[a]dministrative, clerical, or routine acts demanding no special expertise fall in the realm of simple negligence." (Citation and punctuation omitted.) *MCG Health, Inc. v. Casey*, 269 Ga. App. at 128. For example, a claim that a hospital failed to have appropriate equipment is one for ordinary negligence. *Jenkins County Hosp. Auth. v. Landrum*, 206 Ga. App. 753 (426 SE2d 572) (1992); *Candler Gen. Hosp. v. McNorrill*, 182 Ga. App. 107, 109-110 (2) (354 SE2d 872) (1987).[31] In addition, a claim which alleges a violation of a general duty of care, rather than "a standard of care peculiar to a professional," is not a claim for medical malpractice. *Boggs v. Bosley Med. Institute*, 228 Ga. App. 598, 600 (1) (a) (492 SE2d 264) (1997).[32] Essentially, when "the decisive factor in the injury forming the basis" of a plaintiff's complaint "was not a medical misjudgment," the claim is for ordinary negligence. *Candler Gen. Hosp. v. McNorrill*, 182 Ga. App. at 109-110 (2).

"[W]e must look to the substance of an action against a medical professional, hospital, or health care facility in determining whether the action is one for professional or simple negligence." *Moore v. Louis Smith Mem. Hosp.*, 216 Ga. App. at 299. The issue of whether a claim is one for professional or simple negligence is a question of law for the court, to be decided based "only [on] the allegations in the complaint construed most favorably to [the plaintiff], even if other less favorable constructions are possible." *Brown v. Tift County Hosp. Auth.*, 280 Ga.

---

[31] See also *Sood v. Smeigh*, 259 Ga. App. 490, 494-495 (1) (578 SE2d 158) (2003) (a surgeon's "mechanical act" of reassembling a prosthetic knee joint required merely complying with the instructions of the manufacturer, rather than the exercise of professional knowledge and skill).

[32] For example, because "[i]t is improper for *any person* to defraud another[,] as that is a standard of society from which no one is excepted[,]" a doctor's duty not to defraud his patients does not arise by virtue of the doctor's "specialized expertise or his status as a professional." (Citation and punctuation omitted; emphasis in original.) *Boggs v. Bosley Med. Institute*, 228 Ga. App. at 600 (1) (a). As a result, a fraud claim against a doctor is not a claim for malpractice, even where the fraud concerned the medical treatment itself. Id.

App. 847, 850, n. 3 (635 SE2d 184) (2006). See also *Jones v. Bates*, 261 Ga. at 242 (2), n. 4 (the issue of whether a claim sounds in professional malpractice or simple negligence "is resolved based on the status of the pleadings"); *MCG Health, Inc. v. Casey*, 269 Ga. App. at 128 (the issue is a question of law for the court).

The Board and MCGHI contend Canas's failure to warn claim is one for medical malpractice because "the various alleged administrative failures all necessitated the use of medical judgment," relying on *Bradway v. American Nat. Red Cross*, 263 Ga. at 21. In *Bradway*, the plaintiff, who was infected with HIV by a transfusion, claimed that the Red Cross negligently failed to ask screening questions of blood donors that would allow it to identify and eliminate donors at high risk of being HIV infected. Id. at 22. The Supreme Court of Georgia found that the steps involved in the collection, processing, and distribution of blood constituted a professional medical service. Id. at 21. The Court concluded that the plaintiff's claim was one for malpractice under OCGA § 9-3-70 because the questions designed to screen out unsuitable donors were the product of medical knowledge and judgment. Id. at 21-22.[33]

Canas's claim, however, is fundamentally different. In *Bradway*, the allegedly negligent conduct was identifying the types of information from a donor's medical history which were required to determine whether the donor's blood was likely to be infected with HIV. This is a medical question, and a jury could have inferred that the blood bank's failure to ask certain questions represented a medical misjudgment. In this case, the decisive factor in the injury forming the basis of Canas's claim was the hospital's decision not to notify its patients who had received untested blood of the resulting risk of HIV infection. The hospital's decision in March 1985 to stop using untested blood for transfusions demonstrated the hospital's awareness that transfusing patients with untested blood exposed patients to an unacceptable risk of HIV transmission. Thus, the hospital had already made the medical judgment that using untested blood carried an unacceptable risk of infecting recipients with HIV. Highly specialized expert knowledge was not required to grasp this fact; it was accessible to a layman. Further, there is no evidence in the record that the hospital's decision not to notify transfusion recipients of their possible exposure to HIV represented a medical judgment that the unfortunate few, like Canas, who had been infected as a result of their transfusions would be medically benefitted by remaining ignorant of

---

[33] Cf. *Weiner v. Lenox Hill Hosp.*, 673 NE2d 914, 916-917 (N.Y. App. 1996) (claim against hospital based on inadequacy of blood testing and screening procedures was one for simple negligence because the allegedly negligent conduct did not bear a substantial relationship to the rendition of medical treatment to a particular patient).

their exposure. Rather, evidence in the record suggests that the decision not to notify the hospital's transfusion recipients was made by administrators based on concerns about the expense, logistical complexity, and legal implications of such a patient notification program. There is evidence in the record which supports an inference that this aspect of hospital operations was not required to be performed by a person with medical training or that it involved the exercise of medical judgment or required medical expertise. See *Doe v. Vanderbilt Univ.*, 958 SW2d 117, 121-122 (Tenn. App. 1997) (claim based on university hospital's failure in 1987 and 1988 to individually notify patients who received blood transfusions prior to March 1985 that the blood they received had not been tested for HIV was not a medical malpractice claim; there was evidence that the administrative complexities and costs associated with a notification program were outside the purview of the hospital's doctors).[34] As in *Doe*, the challenged conduct was not diagnosis or treatment; the challenged conduct was the decision not to notify transfusion recipients. Furthermore, if the hospital had adopted a notification program, searching hospital records to identify recipients of transfusions during the relevant time period and mailing notices to them would have been administrative, clerical, or routine acts demanding no professional expertise.

Because Canas's failure to warn claim was based on ordinary rather than professional negligence, it is not subject to the medical malpractice statute of repose and statute of limitation. Instead, the claim is subject to the general personal injury statute, OCGA § 9-3-33, which provides that actions shall be brought within two years after the right of action accrues. As distinguished from the medical malpractice statutes, the general personal injury limitation period is tolled until the plaintiff reaches the age of majority. OCGA § 9-3-90 (a); *Hart v. Appling County School Bd.*, 266 Ga. App. 300, n. 2 (597 SE2d 462) (2004) (physical precedent only); *Mitchell v. Hamilton*, 228 Ga. App. 850, 852 (3) (493 SE2d 41) (1997). Because the cause of action accrued while Canas was a minor, the limitation period was tolled until November 1, 2002, the day on which he turned eighteen.[35] Canas instituted his action against all defendants before the limitation period expired. As a result, the Board and MCGHI are not

---

[34] But see *Smith v. American Red Cross*, 886 FSupp. 1494, 1499 (E.D. Mo. 1995) (blood bank's donor "lookback procedure involve[d] medical expertise and judgment at every stage[,] including the determination of when to initiate such procedure, the formulation of the procedure, and the execution of same").

[35] In addition, the continuing tort doctrine applies outside the context of medical malpractice. See, e.g., *Miles v. Ashland Chem. Co.*, 261 Ga. 726, 727 (410 SE2d 290) (1991) (continuing tort doctrine); *Everhart v. Rich's*, 229 Ga. at 802 (2) (same).

entitled to judgment as a matter of law on Canas's failure to warn claim on the basis that it was not timely filed. *Jones v. Bates*, 261 Ga. at 242 (2); *Moore v. Louis Smith Mem. Hosp.*, 216 Ga. App. at 299.

(b) MCGHI contends Canas did not suffer any injury after July 1, 2000, when MCGHI took over operation of the hospital. As a result, MCGHI contends, it is entitled to judgment as a matter of law because it could not have proximately caused any of Canas's injuries. The evidence, however, does not demand a finding that Canas suffered no harm after that date. Accordingly, this argument lacks merit.

(c) Kaminer contends Canas's claim that, as the Board's and MCGHI's agent, she breached an "administrative" duty to warn was embraced in his claim for medical malpractice. As a result, Kaminer contends, she is entitled to summary judgment under the medical malpractice statute of repose and statute of limitation. In this instance, we agree. It is undisputed that Kaminer did not participate in or order any transfusion of untested blood; rather, the evidence shows that Canas acquired HIV from a transfusion years before Kaminer started treating him. We find no basis for concluding that Kaminer individually had an administrative duty to notify the hospital's transfusion recipients of their possible exposure to HIV. The undisputed evidence indicates that Kaminer's failure to appreciate that Canas needed to be tested for HIV resulted from her focus on the single question of whether his heart and pacemaker were performing satisfactorily. To the extent this failure means that Kaminer's care fell below the standard of care, an issue for the finder of fact, it was a *medical* misjudgment. Accordingly, Canas's failure to warn claim against Kaminer is embraced within his claim against her for medical malpractice. See Division 1, supra.

(d) The Board contends its decision not to notify patients who received transfusions between 1978 and 1985 of the risk they had received blood products from donors infected with HIV was a discretionary function. As a result, the Board contends, Canas's failure to warn claim is barred by the doctrine of sovereign immunity. The Board, however, failed to show that this argument was presented to the trial court for consideration. Because Canas did not have an opportunity to respond to this argument in the lower court, the issue is not properly before us on appeal.

3. Qualification of Experts

Kaminer and the Board appeal the trial court's ruling denying their motions to disqualify Canas's expert witnesses. "The issue of the admissibility or exclusion of expert testimony rests in the broad discretion of the court, and[,] consequently, the trial court's ruling thereon cannot be reversed absent an abuse of discretion." (Footnote omitted.) *Cotten v. Phillips*, 280 Ga. App. 280, 283 (633 SE2d 655) (2006).

(a) Roger A. Williams, M.D.

Canas presented the testimony of Roger A. Williams, M.D., as to his opinion, inter alia, that the hospital was negligent as a matter of administrative policy in failing by 1987 to implement either a universal patient notification program for all patients transfused at the hospital from 1978 to 1985 *or* a focused patient notification program which would have targeted patients transfused during that period who had other risk factors (e.g., having received many units of blood or blood products). Williams also criticized the hospital's communications and record keeping practices. In denying the motions to disqualify Williams, the trial court applied OCGA § 24-9-67.1 (b),[36] which addresses expert testimony generally.

On appeal, the Board contends that the trial court's conclusion that Williams's testimony satisfied the requirements of OCGA § 24-9-67.1 (b) was clearly erroneous and, therefore, that the trial court abused its discretion in denying its motion to disqualify Williams. Specifically, the Board contends Williams's testimony failed the third requirement of OCGA § 24-9-67.1 (b), that the expert "applied [reliable] principles and methods reliably to the facts of the case," because two of the sources he identified, the Centers for Disease Control and the Public Health Service, did not in fact recommend notification of all patients transfused between 1977 and 1985, and because the report of the third source, the Presidential Commission on the Human Immunodeficiency Virus Epidemic, "cannot be considered medical literature."

Viewing Williams's testimony as a whole, the trial court was authorized to conclude that he applied reliable principles and methods reliably to the facts of the case. See *Moran v. Kia Motors America*, 276 Ga. App. 96, 98 (1) (622 SE2d 439) (2005) (factors relevant to analysis under OCGA § 24-9-67.1 (b) include "whether the specialized theory or technique has been or can be tested, the theory's general acceptance in the expert community, rate of error, and peer review"). Further, through cross-examination, the appellees have tested and may continue to test Williams's application of the authorities upon which he relies to the facts of the case. We cannot say that

---

[36] OCGA § 24-9-67.1 (b) provides:
   If scientific, technical, or other specialized knowledge will assist the trier of fact in any cause of action to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if:
      (1) The testimony is based upon sufficient facts or data which are or will be admitted into evidence at the hearing or trial;
      (2) The testimony is the product of reliable principles and methods; and
      (3) The witness has applied the principles and methods reliably to the facts of the case.

the trial court manifestly abused its discretion in ruling that the testimony is reliable enough to be admitted under OCGA § 24-9-67.1 (b). See *Moran v. Kia Motors America*, 276 Ga. App. at 98 (1).

(b) Steven L. Shore, M.D.

Steven L. Shore, M.D., testified, inter alia, as to his opinion that the hospital was negligent in failing to implement a patient notification program by 1988 and in failing to maintain appropriate records regarding Canas's transfusion history, including related blood test results, and dental surgery. Citing OCGA § 24-9-67.1 (c) (2) (A),[37] the Board contends that, because Shore is not regularly engaged in the

---

[37] In full, OCGA § 24-9-67.1 (c) provides:

Notwithstanding the provisions of subsection (b) of this Code section and any other provision of law which might be construed to the contrary, in professional malpractice actions, the opinions of an expert, who is otherwise qualified as to the acceptable standard of conduct of the professional whose conduct is at issue, shall be admissible only if, at the time the act or omission is alleged to have occurred, such expert:

(1) Was licensed by an appropriate regulatory agency to practice his or her profession in the state in which such expert was practicing or teaching in the profession at such time; and

(2) In the case of a medical malpractice action, had actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given as the result of having been regularly engaged in:

(A) The active practice of such area of specialty of his or her profession for at least three of the last five years, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in performing the procedure, diagnosing the condition, or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue; or

(B) The teaching of his or her profession for at least three of the last five years as an employed member of the faculty of an educational institution accredited in the teaching of such profession, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in teaching others how to perform the procedure, diagnose the condition, or render the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue; and

(C) Except as provided in subparagraph (D) of this paragraph:

(i) Is a member of the same profession;

(ii) Is a medical doctor testifying as to the standard of care of a defendant who is a doctor of osteopathy; or

(iii) Is a doctor of osteopathy testifying as to the standard of care of a defendant who is a medical doctor; and

(D) Notwithstanding any other provision of this Code section, an expert who is a physician and, as a result of having, during at least three of the last five years immediately preceding the time the act or omission is alleged to have occurred, supervised, taught, or instructed nurses, nurse practitioners, certified registered nurse anesthetists, nurse midwives, physician's assistants, physical therapists, occupational therapists, or medical support staff, has knowledge of the standard of care of that health care provider under the circumstances at issue shall be competent to testify as to the standard of that health care provider.

active practice of "hematology, pathology, blood banking, or hospital administration, which are the pertinent practice areas for issues regarding notification of transfusion recipients about the risk of contracting AIDS through transmission of HIV," Shore was not qualified "as a blood banking expert" to testify regarding such issues. In response to this argument, Canas contends that a portion of Shore's testimony concerns "the hospital's administrative performance" and not its professional medical duties and services, and, therefore, that the testimony was subject to the less restrictive standards of OCGA § 24-9-67.1 (b). See Division 2 (a), supra. We agree that OCGA § 24-9-67.1 (b) applies to Shore's testimony as it relates to Canas's failure to warn claim.

As with Williams's testimony, the trial court was authorized to conclude that Shore's testimony on issues other than medical malpractice was admissible under OCGA § 24-9-67.1 (b). As for Shore's testimony on the issue of Al-Jabi's and Kaminer's alleged medical malpractice, see Division 3 (c), supra.

(c) John W. Sleasman, M.D., Janice E. Milligan, M.D., and Steven L. Shore, M.D., on the professional standard of care.

John W. Sleasman, M.D., testified as to his opinion that Al-Jabi's and Kaminer's failure to keep a growth chart regarding Canas and to attempt to determine the cause of his profoundly stunted growth fell below the standard of care. Sleasman also criticized the doctors' failure to recognize the significance of Canas's transfusion history coupled with his repeated fever-inducing illnesses, chronic infections, and other classic symptoms of pediatric AIDS. Similarly to Sleasman, Janice E. Milligan, M.D., testified as to her opinion that Al-Jabi's and Kaminer's failure to monitor Canas's growth and to compare his growth to the curves on a standard growth chart fell below the standard of care. Milligan also criticized Al-Jabi's and Kaminer's focus on Canas's cardiac function and transitory illnesses and their failure to look "at the larger picture" and consider the possible implications of his transfusion history, his growth disturbance, and the frequency and nature of his infectious illnesses. Milligan opined that Al-Jabi and Kaminer should have investigated whether Canas's health problems might have been caused by something other than his congenital heart defect or made appropriate referrals for such investigation. Shore opined that Al-Jabi's and Kaminer's treatment of Canas, particularly their failure to recognize his failure to grow normally, their failure to consult his medical

---

However, a nurse, nurse practitioner, certified registered nurse anesthetist, nurse midwife, physician's assistant, physical therapist, occupational therapist, or medical support staff shall not be competent to testify as to the standard of care of a physician.

records, and their failure to refer Canas for further examination and treatment, fell below the standard of care. In denying the motions to disqualify Sleasman, Milligan, and Shore, the trial court applied OCGA § 24-9-67.1 (c), which governs the admissibility in professional malpractice actions of "the opinions of an expert, who is otherwise qualified as to the acceptable standard of conduct of the professional whose conduct is at issue." See Division 3 (b), supra.

Kaminer and the Board contend that the trial court erred in finding that Sleasman, Milligan, and Shore are qualified under OCGA § 24-9-67.1 (c) to testify regarding the standard of care governing Kaminer's professional conduct because the witnesses are not regularly engaged in the active practice of Kaminer's specialty, pediatric cardiology. In essence, Kaminer and the Board argue that OCGA § 24-9-67.1 (c) requires that an expert testifying about the standard of care in a medical malpractice case actively practice in the same specialty or practice area as the professional whose conduct was alleged to be negligent. We recently rejected this argument in *Cotten v. Phillips*. In that case, we held that the General Assembly intended the statute to require simply that "an expert must have knowledge and experience in the area of practice or specialty about which [the expert] is providing testimony." 280 Ga. App. at 284. We held that the statute's language plainly contemplates "that [an] expert may very well have a different area of practice than the defendant doctor." Id. at 284-285. Under the statute, it is the expert's qualifications, vis a vis the area of practice or specialty in which the expert is providing the opinion, rather than the defendant doctor's specialty or area of practice, that controls whether the trial court should allow the expert's testimony. Id.

This distinction becomes clear in application. The plaintiff in *Cotten v. Phillips* sought to use the testimony of a vascular surgeon on the issue of whether, given the patient's medical history, the defendant doctor, an orthopedic surgeon, negligently failed to assess the vascular issues involved in the patient's surgery and recovery. Id. at 281-282. We found that the evidence in the record supported the trial court's determination that the area of practice in which the opinion was to be given was vascular surgery and that the witness, as a vascular surgeon, was qualified to give an opinion in that area. Id. at 287.

In this case, the trial court was authorized to find that Canas's experts are offering opinions in the area of practice or specialty of pediatric medicine. As the trial court noted, for the previous five years, Sleasman has practiced in the fields of pediatrics, allergy and immunology, and diagnostic and laboratory immunology; Milligan has practiced in the area of pediatrics, specializing in primary care; and Shore has practiced in pediatrics, specializing in infectious

diseases. Thus, the record supported the trial court's finding that each of these witnesses has been actively engaged in the practice of pediatrics for at least three of the last five years with sufficient frequency to establish an appropriate level of knowledge concerning the practice of pediatric medicine. *Cotten v. Phillips*, 280 Ga. App. at 287. The trial court did not abuse its discretion in denying the motions to disqualify Canas's experts based on OCGA § 24-9-67.1 (c).

Having found that the trial court did not abuse its discretion in qualifying Canas's expert witnesses for any of the reasons argued, we affirm the trial court's evidentiary rulings.

*Judgment affirmed. Johnson, P. J., and Miller, J., concur.*

DECIDED NOVEMBER 20, 2006 —
RECONSIDERATIONS DENIED DECEMBER 8, 2006 — ▮

*Scherffius, Ballard, Still & Ayres, William L. Ballard, Carter & Ansley, J. Robert Persons*, for Canas.

*Oliver, Maner & Gray, Leslie P. Sheehan, William P. Franklin, Jr.*, for Al-Jabi et al.

*Carlock, Copeland, Semler & Stair, Adam L. Appel, Kim M. Ruder*, for Kaminer.

*Thurbert E. Baker, Attorney General, Kathleen M. Pacious, Deputy Attorney General, Bryan F. Dorsey*, for Board of Regents of the University System of Georgia.

*Hull, Towill, Norman, Barrett & Salley, James S. V. Weston*, for MCG Health, Inc.